UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDUARDO NEGRETE AND GERVASIO NEGRETE,<br><br>Plaintiffs,<br><br>v.<br><br>CITIBANK, N.A.<br><br>Defendant. | Docket No. 15 Civ. 7250<br>(ECF Case)<br><br>**COMPLAINT** |

## NATURE OF THE ACTION

1.  This is an action based on Defendant Citibank, N.A.'s ("Citibank") failure to inform Plaintiffs that Citibank was marking up Plaintiffs' orders regarding foreign exchange ("FX") trades.  As a result of this undisclosed markup, Citibank failed to execute trades as instructed by Plaintiffs, misrepresented to Plaintiffs why trades were not executed, and made undisclosed profits from trades that were executed.

2.  In addition, for years Citibank miscalculated the collateral available to Plaintiffs for FX trades and, as a result, deliberately failed to execute numerous FX trades as instructed by Plaintiffs.

## JURISDICTION AND VENUE

3.  The Court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332(a)(2).

4.  This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in New York.  Additionally, Defendant consented to the jurisdiction in the United States District Court located in the Borough of Manhattan in New York City.

1

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).

## THE PARTIES

6.      Plaintiff Gervasio Negrete is a Mexican citizen.  He maintains several bank accounts with Citibank and signed an International Swaps and Derivatives Association Master Agreement with Citibank to enable him to execute FX transactions through Citibank, among other transactions.

6.      Plaintiff Eduardo Negrete is a Mexican citizen.  He maintains several bank accounts with Citibank and signed an International Swaps and Derivatives Association Master Agreement with Citibank to enable him to execute FX transactions through Citibank, among other transactions.

7.      Defendant Citibank, N.A. is a National Association that operates as a bank with its principal place of business in New York, New York.

## THE FACTS

8.      Plaintiffs have been banking with Citibank and its predecessor for more than 27 years.  They both had numerous accounts with Citibank and millions of dollars in assets held in those accounts.

9.      On October 30, 2007, Plaintiffs executed an International Swap Dealers Association, Inc. Master Agreement with Citibank ("2007 ISDA Agreement").

10.     The 2007 ISDA Agreement enabled Plaintiffs to instruct Citibank to execute FX transactions and other derivative transactions on Plaintiffs' behalf.

11.     On August 13, 2010, Plaintiff Gervasio Negrete executed an additional International Swap Dealers Association, Inc. Master Agreement with Citibank ("2010 ISDA Agreement," and collectively with the 2007 ISDA Agreement, "ISDA Agreements").

2

12.     Pursuant to the ISDA Agreements, Plaintiffs executed thousands of transactions through Citibank, sometimes as many as 10 to 15 per day.

13.     The total notional value of Plaintiffs' FX trading through Citibank was approximately $15 billion per year.

**The Undisclosed Markups**

14.     Citibank never told Plaintiffs that it was "marking-up" Plaintiffs' trade instructions.

15.     Upon information and belief, Citibank maintained an internal and undisclosed policy requiring a 1 to 3 basis point mark-up on an FX trade to execute the trade on behalf of Plaintiffs.

16.     As a result, even though Plaintiffs gave instructions to Citibank to execute a trade if the market reached a certain threshold, Citibank would only act on these instructions if the trade could be executed at that threshold and leave a sufficient markup for Citibank.  This was not disclosed to Plaintiffs.

17.     On numerous occasions, Plaintiffs noticed that their instructions had not been executed even though the market reached the appropriate threshold.

18.     In addition, on numerous occasions, Plaintiffs noticed that only a portion of their order had been executed such that only a lesser amount of the currency was traded rather than full amount ordered.

19.     On each occasion, Plaintiffs called Citibank and asked why their trades had not been executed as instructed.  Plaintiffs estimate that they placed approximately 150 such calls to Citibank.

20.     Each time Plaintiffs called, they were falsely told that the market had not reached the threshold of the order.

21.     These representations by Citibank were false.

22.     At no point in response to these inquiries did Citibank indicate that it failed to execute the trade in full because Citibank could not markup the trade as much as it wanted.

23.     Thus Citibank failed to execute Plaintiffs' explicit instructions for the sole reason that it was not going to realize a profit that Citibank believed to be sufficient.  Then Citibank lied to Plaintiffs about the reason Citibank failed to execute the trades as instructed.

24.     Citibank did not disclose these markups to many other FX customers as well.

25.     As a result, in May 2015, Citibank made a disclosure to its customers regarding its FX terms of dealing.  As stated in the notice, "the purpose of the notic[e was] to disclose certain practices of Citicorp and its affiliates . . . when it acted as a dealer, on a principal basis, in the spot foreign exchange ('FX') markets."

26.     By acting on a principal basis, Citibank is acting on its own behalf for its own benefit.

27.     Citibank admitted that certain conduct "was contrary to the Firm's policies, unacceptable, and wrong," and disclosed additional wrongful practices.

28.     Citibank disclosed that "We have, without informing clients, worked limit orders at levels (i.e., prices) better than the limit order price so that we would earn a spread or markup in connection with our execution of such orders.  This practice could have impacted clients in the following ways: (1) clients' limit orders would be filled at a time later than when the Firm could have obtained currency in the market at the limit orders' prices, and (2) clients' limit orders would not be filled at all, even though the Firm had or could have obtained currency in the market at the limit orders' prices. For example, if we accepted an order to purchase €100 at a limit of 1.1200 EURUSD, we might choose to try to purchase the currency at a EURUSD rate of 1.1199 or better

so that, when we sought in turn to fill the client's order at the order price (i.e., 1.1200), we would make a spread or markup of 1 pip or better on the transaction. If the Firm were unable to obtain the currency at the 1.1199 price, the clients' order may not be filled as a result of our choice to make this spread or markup."

29.     In addition, the disclosure stated "We made decisions not to fill clients' limit orders at all, or to fill them only in part, in order to profit from a spread or markup in connection with our execution of such orders.  For example, if we accepted a limit order to purchase €100 at a EURUSD rate of 1.1200, we would in certain instances only partially fill the order (*e.g.*, €70) even when we had obtained (or might have been able to obtain) the full €100 at a EURUSD rate of 1.1200 or better in the marketplace. We did so because of other anticipated client demand, liquidity, a decision by the Firm to keep inventory at a more advantageous price to the Firm, or for other reasons. In doing so, we did not inform our clients as to our reasons for not filling the entirety of their orders."

30.     The markup that Citibank realized on trades that it did execute on behalf of Plaintiffs was not disclosed to Plaintiffs.  The markup was not listed on Plaintiffs' statements or account information.

31.     As such, Plaintiffs do not currently know how much Citibank profited from these undisclosed markups but estimate that it is at least $20 million, or perhaps far more.

32.     In addition, Plaintiffs lost the opportunity to profit from unexecuted or partially-executed trades.

**Miscalculated Collateral**

33.     In addition to the undisclosed markups by Citibank, Plaintiffs were also damaged by Citibank miscalculating the collateral in Plaintiffs' accounts.

34.     Plaintiffs instructed Citibank to execute numerous transactions that Citibank refused to execute, wrongly claiming that Plaintiffs lacked sufficient collateral for the trades.

35.     At this time, Plaintiffs do not know the precise number of times Citibank failed to act upon Plaintiffs' instructions but chose not to do so based on the erroneous calculation of Plaintiffs' collateral – Plaintiffs will need discovery to determine that precise calculation.

36.     Plaintiffs discovered Citibank's erroneous calculation of Plaintiffs' collateral in January 2015.

37.     In the last full week of November 2014, Plaintiff Gervasio Negrete instructed Citibank to sell €5,000,000 against the U.S. Dollar if a certain price in the FX market was reached. The instruction was explicitly made "Good 'Til Cancelled" or "GTC."

38.     Plaintiffs never cancelled the instruction to sell €5,000,000 against the U.S. Dollar.

39.     On December 2, 2014, due to a calculation error by Citibank, Citibank issued a margin call with respect to Plaintiffs' accounts.

40.     Citibank also cancelled the €5,000,000 order due to the incorrect margin call that day. Citibank further failed to inform Plaintiffs that it had cancelled the order.

41.     On December 2, 2014, Lawrence Salgado, a relationship officer at Citibank, called Plaintiff Eduardo Negrete and asked him to transfer assets between his accounts. Mr. Negrete later learned that the purpose was to increase the collateral to cover margin calls. Unaware that the purpose of the requested transfer was related to an incorrect margin call, Mr. Negrete did not dispute the margin call at that time and transferred additional assets to the relevant Citibank accounts as requested.

42.     Plaintiffs thereafter asked Citibank to check the calculations. Citibank refused to do so.

6

43.     Mr. Salgado did not inform Plaintiff Eduardo Negrete that Citibank had cancelled the instruction to sell €5,000,000 against the U.S. Dollar as a result of the margin call.

44.     On December 5, 2014, Eduardo Negrete called Mario Meza, another Citibank employee, to discuss how to avoid margin calls in the future since the market for trading of U.S. dollars and Mexican Pesos was moving against them.  Citibank had previously identified Mr. Meza as the appropriate person to contact regarding margin calls.

45.     Mr. Meza responded by email that he would look into the situation and contact Gervasio Negrete when he had an answer.

46.     On December 10, 2014, Citibank again contacted Plaintiffs and indicated there was a margin call.  Again, the margin call was the result of an incorrect calculation by Citibank, unknown to Plaintiffs.

47.     Again, however, Plaintiffs transferred assets to satisfy the margin call.

48.     Citibank made two additional margin calls that week; all were erroneous.

49.     As a result of the numerous margin calls, Gervasio Negrete transferred tens of millions of Mexican pesos into Citibank accounts and closed four FX positions unrelated to the €5,000,000 order discussed above.

50.     On December 17, 2014, the FX market reached the level of the €5,000,000 order and the trade should have been executed.  Citibank failed to execute the order, however, because it cancelled the order 15 days earlier in connection with an erroneous margin call.

51.     On December 17, 2014, Gervasio Negrete called Citibank to ask about the €5,000,000 order.  The call was placed outside of NY business hours so Gervasio Negrete called a Citibank office in Europe.

52.     The Citibank representatives told Gervasio Negrete that they could not find the order.

53.     Later that day, Gervasio Negrete called Citibank's New York office to ask about the €5,000,000 order.  The New York office could not find the order either.

54.     Gervasio Negrete was informed that his banker at Citibank, Rodrigo Curiel, was out of the office and was unreachable until later that day.

55.     Gervasio Negrete made additional calls to the New York office about the order but was again told that the Citibank personnel could not find the order.  At no point was Gervasio Negrete informed that the order had been cancelled.

56.     When Gervasio Negrete finally spoke to Rodrigo Curiel much later in the day on December 17, 2014, he was, for the first time, told that the order had been cancelled.

57.     By that time, the FX market had shifted and it was too late to execute the trade at an appropriate price.

58.     If the €5,000,000 trade had been executed on December 17, 2014, it would have resulted in at least $700,000 in profit to Plaintiffs.

59.     In addition, if Citibank had informed Plaintiffs that the trade had been cancelled, Plaintiffs could have reauthorized the trade and generated an even greater profit.

60.     Plaintiffs thus requested all information regarding the December 2014 margin calls and the underlying calculations.

61.     As a result, Citibank conducted an investigation into the calculation of Plaintiffs' collateral and the resulting margin calls.

62.     Through that investigation, Citibank determined, and admitted, that it improperly calculated Plaintiffs' collateral due to a "process failure" and that there was sufficient collateral in the account at the time the trade was cancelled.

63.     Further, the calculations demonstrate that Citibank has been miscalculating Plaintiffs' collateral and the resulting margin calls for years.

64.     Without discovery, Plaintiffs are not able to determine the precise number of erroneous margin calls and the resulting damage to Plaintiffs.  Given the large number of margin calls, however, and the magnitude of the miscalculation, a substantial number were likely erroneous.

65.     Plaintiffs closed positions they would not have otherwise closed and Citibank cancelled additional profitable instructions based on these erroneous margin calls.

### FIRST CAUSE OF ACTION
### (Fraud – Undisclosed Markups)

66.     Each of the foregoing paragraphs is incorporated herein by reference.

67.     Citibank made a material omission by failing to inform Plaintiffs that Citibank required and was taking a markup on Plaintiffs' FX trades.

68.     Further, Citibank misrepresented to Plaintiffs why trades were not executed or were only partially executed.

69.     Citibank knew that it was taking a markup but intentionally failed to disclose this fact to Plaintiffs or, at a minimum, was reckless in not disclosing the true reason Plaintiffs' trades were not executed as instructed.

70.     Plaintiffs relied upon Citibank's representations in making their trade instructions to Citibank.  Had they known of Citibank's undisclosed markups they could have altered their trade instructions and could have chosen to conduct their FX trades through other entities.

71.     Citibank's misrepresentations and omissions were material in that Citibank made at least $20,000,000 in undisclosed profit as a result of this markup, and Plaintiffs were not able to profit based on hundreds of unexecuted trades.

72.     As result of Citibank's fraud, Plaintiffs have been damaged in an amount to be determined at trial but at least equal to the amount of profit Citibank made from the undisclosed markups and the amount of profit Plaintiffs failed to realize from unexecuted and partially-executed trades.

**SECOND CAUSE OF ACTION**
**(Breach of Contract – Undisclosed Markups)**

73.     Each of the foregoing paragraphs is incorporated herein by reference.

74.     The ISDA Agreements between Plaintiffs and Citibank are valid and binding contracts.

75.     The ISDA Agreements required Citibank to execute Plaintiffs instructions and deliver the assets specified in those instructions.

76.     Plaintiffs performed all of their obligations under the ISDA Agreements.

77.     Citibank breached the ISDA Agreements by failing to execute trades or partially executing trades as instructed because it sought an undisclosed markup.

78.     Citibank also breached the implied covenant of good faith and fair dealing by taking and failing to disclose the markup Citibank sought on the trades.

79.     As result of Citibank's breach of contract, Plaintiffs have been damaged in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Breach of Contract – €5,000,000 Order)**

80.     Each of the foregoing paragraphs is incorporated herein by reference.

81.     The ISDA Agreements between Plaintiffs and Citibank are valid and binding contracts.

82.     The ISDA Agreements required Citibank to execute Plaintiffs' instructions and deliver the assets specified in those instructions.

83.     Plaintiffs performed all of their obligations under the ISDA Agreements and the €5,000,000 order.

84.     Citibank breached the ISDA Agreements by erroneously cancelling and failing to execute the €5,000,000 order.

85.     Citibank also breached the implied covenant of good faith and fair dealing by erroneously cancelling and failing to execute the €5,000,000 order.

86.     As result of Citibank's breach of contract, Plaintiffs have been damaged in an amount to be determined at trial.

<b><u>FOURTH CAUSE OF ACTION</u></b><br>
<b>(Negligence – €5,000,000 Order)</b>

87.     Each of the foregoing paragraphs is incorporated herein by reference.

88.     With respect to each trade instruction by Plaintiffs, Citibank had a duty to execute the trade pursuant to Plaintiffs' instructions.

89.     Citibank breached that duty when it failed to execute the €5,000,000 trade Gervasio Negrete instructed Citibank to make.

90.     Citibank further breached its duty by failing to even inform Plaintiffs that it had cancelled the order in a timely fashion.

91.     As a result of Citibank's negligence, Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Contract – All Margin Calls)

92.     Each of the foregoing paragraphs is incorporated herein by reference.

93.     The ISDA Agreements between Plaintiffs and Citibank are valid and binding contracts.

94.     The account applications and other account opening documents also contained valid and binding contractual provisions.

95.     The ISDA Agreements and account documents required Citibank to monitor the value of Plaintiffs' accounts accurately and make margin calls only when appropriate.

96.     Plaintiffs performed all of their obligations under the ISDA Agreements and other account documentation.

97.     Citibank breached the ISDA Agreements and account documentation by erroneously calculating Plaintiffs' collateral and making unnecessary margin calls.

98.     Citibank also breached the ISDA Agreements by cancelling Plaintiffs' trade instructions due to those erroneous margin calls.

99.     Citibank further breached the implied covenant of good faith and fair dealing by erroneously calculating Plaintiffs' collateral and making unnecessary margin calls.

100.    As result of Citibank's breach of contract, Plaintiffs have been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Negligence – All Margin Calls)

101.    Each of the foregoing paragraphs is incorporated herein by reference.

102.    With respect to each trade instruction by Plaintiffs, Citibank had a duty to execute the trade pursuant to Plaintiffs' instructions.

103. Citibank also had a duty to properly calculate Plaintiffs' collateral and execute appropriate margin calls.

104. Citibank breached these duties by erroneously calculating Plaintiffs' collateral and making wrongful margin calls.

105. As a result of Citibank's breaches, Plaintiffs have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against the Defendant as follows:

A.    An award of Plaintiffs' actual damages in an amount to be determined at trial including, but not limited to, the amount of the undisclosed markup Citibank received from Plaintiffs' FX trades and Plaintiffs' losses and unrealized profits from trades Citibank failed to execute or partially executed due to its undisclosed markup;

B.    An award of Plaintiffs' actual damages in an amount to be determined at trial including, but not limited to, losses and lost profits resulting from the unexecuted €5,000,000 trade;

C.    An award of Plaintiffs' actual damages in an amount to be determined at trial including, but not limited to, losses and lost profits resulting from each wrongly unexecuted trade and losses and lost profits from each transaction Plaintiffs made due to Defendant's erroneous margin calls;

D.    Punitive damages for Citibank's wrongful conduct;

E.    Pre-judgment and post-judgment interest;

F.    Costs;

G.    Attorneys' fees; and

H.    All such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: September 15, 2015
    New York, New York

Respectfully submitted,

LIDDLE & ROBINSON, L.L.P.

By: _____
    Blaine H. Bortnick
    James W. Halter
800 Third Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 687-8500
*Attorneys for Plaintiffs*

14