UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/19/16

----------------------------------------X

EDUARDO NEGRETE AND GERVASIO NEGRETE,

                        Plaintiffs,                15 Civ. 7250

        -against-                                  OPINION

CITIBANK, N.A.,

                        Defendant.

----------------------------------------X

A P P E A R A N C E S :


        Attorneys for Plaintiffs

        LIDDLE & ROBINSON, LLP
        800 Third Avenue
        New York, NY 10022
        By:  Blaine H. Bortnick, Esq.
             James W. Halter, Esq.
             Read K. McCaffrey, Esq.
             Atoosa Esmaili, Esq.


        Attorneys for Defendant

        FRESHFIELDS BRUCKHAUS DERINGER US LLP
        601 Lexington Avenue
        New York, NY 10022
        By:  Marshall H. Fishman, Esq.
             Samuel J. Rubin, Esq.
             Elana S. Bildner, Esq.

**Sweet, D.J.**

Defendant Citibank, N.A. ("Citi" or "Defendant") has moved pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6) to dismiss the Complaint (the "Complaint" or "Compl.") filed by Eduardo Negrete and Gervasio Negrete (the "Negretes" or "Plaintiffs"). The Plaintiffs have cross-moved pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment for breach of contract. Upon the facts and conclusions set forth below, the motion of Citi to dismiss is granted, and the cross-motion of the Negretes for partial summary judgment is denied.

**Prior Proceedings**

The Plaintiffs filed their complaint on September 16, 2015 that alleged the Negretes are Mexican citizens who signed International Swaps and Derivatives Association ("ISDA") Master Agreements with Citi in order to execute foreign exchange ("FX") transactions through Citi (Compl. at ¶ 5, 6).

The Complaint alleged a course of conduct over 27 years, involving millions of dollars, and thousands of

1

transactions approximating $15 billion a year (Compl. at ¶ 8-13). The complaint alleged that in the course of these transactions, the Defendant maintained an undisclosed 1 to 3 basis point mark-up which resulted trades not being executed and misrepresented the reason that the trades were not executed (Compl. at ¶ 14-24).

In May 2015, the Defendant disclosed to its customers certain practices which the Plaintiffs estimate produced a $20 million profit for Citi and caused the Plaintiffs to lose the opportunity to profit (Compl. at ¶ 25-31).

The Complaint also alleged collateral was miscalculated causing order cancellations damaging the Plaintiffs (Compl. at ¶ 31-65).

The Complaint alleged six causes of action: (1) fraud arising out of the undisclosed markups (Compl. at ¶ 66-72), (2) breach of contract arising out of the undisclosed markups (Compl. at ¶ 73-79), (3) breach of contract arising out of a cancelled order (Compl. at ¶ 80-86), (4) negligence arising out of the cancelled order (Compl. at ¶ 87-91), (5) breach of contract arising out of "numerous" margin calls (Compl. at ¶ 92-

100), and (6) negligence arising out of "numerous" margin calls (Compl. at ¶ 101-105).

The motion of Citi and the Negretes' cross-motion for partial summary judgment on their second cause of action were heard and marked fully submitted on January 28, 2015.

**The Facts**

The facts relating to the cross motion are set forth in the Plaintiffs' Statement pursuant to Local Rule 56.1, and the Defendant's Counterstatement in Opposition to Plaintiffs' Rule 56.1 Statement and are not in dispute except as noted below.

The Negretes are Mexican citizens who maintained several bank accounts with Citi. Plaintiffs entered into an ISDA Agreement with Defendant on October 30, 2007 ("2007 ISDA Master Agreement") together with its amendments (the "2007 ISDA"), which governed a number of Foreign Exchange ("FX") and other derivative transactions on behalf of Plaintiffs. Citi refers to the terms of the 2007 ISDA for the contents thereof.

3

Plaintiffs entered into a Schedule to the 2007 ISDA Master Agreement with Defendant dated October 30, 2007. Plaintiffs entered into a Security Agreement to the 2007 ISDA Master Agreement with Defendant dated October 30, 2007. Plaintiffs entered into an Addendum to the Security Agreement to the 2007 ISDA Master Agreement with Defendant dated October 30, 2007. Plaintiffs entered into Amendment No. 1 to the 2007 ISDA Master Agreement with Defendant dated December 5, 2008. (Halter Decl. Ex. 3 at 45-48 of 77). Plaintiffs entered into Amendment No. 2 to the 2007 ISDA Master Agreement with Defendant dated December 5, 2008. Plaintiffs entered into Amendment No. 3 to the 2007 ISDA Master Agreement with Defendant dated March 5, 2014. Plaintiffs and Partizan S.A. de CV entered into a Credit Support Annex to the 2007 ISDA Master Agreement with Defendant dated March 5, 2014.

Plaintiff Gervasio Negrete entered into an ISDA Master Agreement with Defendant dated August 13, 2010 ("2010 ISDA Master Agreement"), entered into a Schedule to the 2010 ISDA Master Agreement with Defendant dated August 13, 2010, and entered into a Credit Support Annex to the 2010 ISDA Master Agreement with Defendant dated August 13, 2010. He entered into Amendment No. 1 to the 2010 ISDA Master Agreement with Defendant

dated May 17, 2013. Plaintiff Gervasio Negrete and Partizan S.A. de CV entered into a Credit Support Annex to the 2010 ISDA Master Agreement with Defendant dated May 17, 2013.

The ISDA Agreements were not alone full agreements for any Foreign Exchange trade. While the ISDAs would govern certain elements of all trades between the parties, Plaintiffs and Defendant would still need to negotiate the essential terms of each individual trade. "The parties [Plaintiffs and Defendant]. . . agree[d] that with respect to each Transaction [pursuant to the ISDAs] a legally binding agreement . . . exist[ed] from the moment that the parties . . . agreed on the essential terms of such Transaction" including § 1(c)) that "All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this 'Agreement'), and the parties would not otherwise enter into any Transactions." (Halter Decl. Ex. 3 at 28 of 77, Ex. 4 at 41 of 83.)

Plaintiffs and Defendant engaged in many individual transactions, though neither party quantified the exact number. Plaintiffs allege that sometimes the parties engaged in as many as 10 to 15 transactions per day. (Compl. at ¶ 12.) However,

Defendant notes that the ISDAs do not indicate or bind the parties to any specific number of transactions.

On approximately May 20, 2015, Citicorp, an affiliate of Defendant, pled guilty to one count of conspiring to rig bids in the FX Spot Market between December 2007 and January 2013 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. The plea agreement described the Defendants' (including Citicorp's) conduct, primarily relating to manipulation of the price for the Euro-U.S. Dollar currency trade. The plea agreement with the United States Department of Justice required Citicorp to make certain disclosures to its FX customers (including Plaintiffs) stating that certain conduct "was contrary to the Firm's policies, unacceptable, and wrong." (Halter Decl., Ex 1 at ¶¶ 9(c)(1), 13).

According to the Defendant, the Sherman Antitrust Act violation at issue in the other case is not at issue in this litigation, and in fact no antitrust claims have been advanced here. Defendant claims that information in the plea agreement is immaterial and has no nexus to the current litigation. Further, according to the Defendant, any portion of the plea agreement

6

should not be considered here because the facts from that plea are not pled properly in the Complaint.

Plaintiffs have cited several sections of the plea agreement to support their claims for breach of contract, fraud, and negligence, in particular, a section titled "Other Relevant Conduct," which includes that Citicorp:

> through its currency traders and sales staff, also engaged in other currency trading and sales practices in conducting FX Spot Market transactions with customers via telephone, email, and/or electronic chat, to wit: (i) intentionally working customers' limit orders one or more levels, or 'pips,' away from the price confirmed with the customer; (ii) including sales markup, through the use of live hand signals or undisclosed prior internal arrangements or communications, to prices given to customers that communicated with sales staff on open phone lines; (iii) accepting limit orders from customers and then informing those customers that their orders could not be filled, in whole or in part, when in fact the defendant was able to fill the order but decided not to do so because the defendant expected it would be more profitable not to do so; and (iv) disclosing non-public information regarding the identity and trading activity of the defendant's customers to other banks or other market participants, in order to generate revenue for the defendant at the expense of its customers.

Halter Decl., Ex 1 at ¶ 13.

The DOJ required that Citi "implement . . . a compliance program designed to prevent and detect" the conduct described in Paragraph 4(g-i) of the plea agreement, which was

7

the primary focus of that case. Those paragraphs focused on

attempts to fix the price of the Euro-U.S. Dollar currency pair

trade. This conduct concerned using a private chat room (with

coded language) to coordinate and manipulate behavior across

financial institutions, sometimes protecting one institutions'

open risk positions.

Part of the Citicorp's required disclosure based on

the plea agreement was that Citicorp:

> without informing clients, worked limit orders at
> levels (i.e., prices) better than the limit order
> price so that we would earn a spread or markup in
> connection with our execution of such orders. This
> practice could have impacted clients in the following
> ways: (1) clients' limit orders would be filled at a
> time later than when the Firm could have obtained
> currency in the market at the limit orders' prices,
> and (2) clients' limit orders would not be filled at
> all, even though the Firm had or could have obtained
> currency in the market at the limit orders' prices.
> For example, if [Citicorp] accepted an order to
> purchase 100 at a limit of 1.1200 EURUSD, we might
> choose to try to purchase the currency at a EURUSD
> rate of 1.1199 or better so that, when we sought in
> turn to fill the client's order at the order price
> (i.e., 1.1200), we would make a spread or markup of 1
> pip or better on the transaction. If the Firm were
> unable to obtain the currency at the 1.1199 price, the
> clients' order may not be filled as a result of our
> choice to make this spread or markup.
>
> Plaintiffs' Rule 56.1 Statement ¶29; Halter Decl., Ex
> 2.

The Complaint does not include any particular trades or specific instances in which the conduct in the above paragraph took place.

Plaintiffs pointed out other conduct noted in the mandatory disclosure, such as:  Citicorp

> made decisions not to fill clients' limit orders at all, or to fill them only in part, in order to profit from a spread or markup in connection with [Citi's] execution of such orders. For example, if [Citi] accepted a limit order to purchase 100 at a EURUSD rate of 1.1200, [Citi] would in certain instances only partially fill the order (e.g., 70) even when [Citi] had obtained (or might have been able to obtain) the full 100 at a EURUSD rate of 1.1200, or better in the marketplace. [Citi] did so because of other anticipated client demand, liquidity, a decision by the Firm to keep inventory at a more advantageous price to the Firm, or for other reasons. In doing so, [Citi] did not inform [its] clients as to [its] reasons for not filling the entirety of their orders.

Plaintiffs' Rule 56.1 Statement ¶31; Halter Decl., Ex 2.

**The Applicable Standards**

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader.  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).  A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

9

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955,

1964, 167 L. Ed. 2d 929 (2007)). A claim is facially plausible

when "the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (quoting

*Twombly*, 550 U.S. at 556). In other words, the factual

allegations must "possess enough heft to show that the pleader

is entitled to relief." *Twombly*, 550 U.S. at 557 (internal

quotation marks omitted).

Additionally, while "a plaintiff may plead facts alleged

upon information and belief 'where the belief is based on

factual information that makes the inference of culpability

plausible,' such allegations must be 'accompanied by a statement

of the facts upon which the belief is founded.'" *Munoz-Nagel v.

Guess, Inc.*, No. 12-1312, 2013 WL 1809772, *3 (S.D.N.Y. Apr. 30,

2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120

(2d Cir. 2010)); *Prince v. Madison Square Garden*, 427 F. Supp.

2d 372, 384 (S.D.N.Y. 2006); *Williams v. Calderoni*, No. 11-3020,

2012 WL 691832, *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings,

however, "must contain something more than . . . a statement of

facts that merely creates a suspicion [of] a legally cognizable

right of action." *Twombly*, 550 U.S. at 555 (citation and
internal quotation omitted).

     Allegations of fraud, must meet the heightened
pleading standard of Federal Rule of Civil Procedure 9(b), which
requires that the plaintiff "state with particularity the
circumstances constituting fraud." Fed. R. Civ. 9(b). Under Rule
9(b), the complaint must: (i) "specify the statements that the
plaintiff contends were fraudulent," (ii) "identify the
speaker," (iii) "state where and when the statements were made,
and" (iv) "explain why the statements were fraudulent." *Lerner
v. Fleet Bank, N.A.*, 459 F.3ed 273, 290 (2d Cir. 2006)
(quotations and citations omitted); *Vista Food Exch. Inc. v.
Champion Foodservice, LLC*, No. 14 Civ. 804, 2015 WL 5000863, at
*9 (S.D.N.Y. Aug. 18, 2015) (same and further holding that "Rule
9(b) pleadings cannot be based on information and belief"
(citing *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972))).

     As the Second Circuit has recognized that the elements
of a fraud claim under New York law are "a material, false
representation, an intent to defraud thereby, and reasonable
reliance on the representation, causing damage to the

plaintiff." *May Dept. Stores Co. v. International Leasing Corp., Inc.*, 1 F.3d 138, 1 (2d Cir. 1993).

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

**The Fraud Claim (Claim I) Fails to Adequately Allege the
Particularity Required by Rule 9(b)**

Plaintiffs have failed to plead with sufficient
particularity to survive a motion to dismiss under Rule 9(b).
Even if the conduct Citicorp admitted in its unrelated antitrust
settlement with the Department of Justice satisfies the elements
of common law fraud, Plaintiffs here have not pled that they
suffered from this conduct with the required particularity to
satisfy Rule 9(b). For the reasons stated below, Plaintiffs have
failed to meet the Rule 9(b) standard.

The Second Circuit has held that the particularity
requirement of Rule 9(b) requires that "the complaint must
adequately specify the statements it claims were false or
misleading, give particulars as to the respect in which
plaintiffs contend the statements were fraudulent, state when
and where the statements were made, and identify those
responsible for the statements." *McLaughlin v. Anderson*, 962
F.2d 187, 191 (2d Cir. 1992).

Here, the Complaint alleges that over an eight year
period: (i) "[o]n numerous occasions, Plaintiffs noticed that

13

their instructions had not been executed even though the market reached the appropriate threshold" (Compl. at ¶ 17); (ii) "on numerous," other "occasions, Plaintiffs noticed that only a portion of their order had been executed such that only a lesser amount of the currency was traded rather than the full amount ordered" (id. at ¶ 18); (iii) after "each occasion" (approximately 150 times) that "Plaintiffs called Citibank and asked why their trades had not been executed as instructed" (id. at ¶ 19); and (iv) that "[e]ach time Plaintiffs called," Plaintiffs allegedly received the exact same response from an unidentified speaker who allegedly said "that the market had not reached the threshold of the order" (id. at ¶ 20).

Plaintiffs claim that these statements satisfy the Rule 9(b) bar because "where the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013). Plaintiffs argue it would be impractical and overly burdensome to require them to plead each instance of the conduct alleged.

14

However, Plaintiffs here do not even provide one example of the alleged conduct. The Court in *Wells Fargo* found that Plaintiff (the Government) satisfied its burden because it "provide[d] examples of specific false claims submitted to the government pursuant to that scheme" and those examples "support more generalized allegations of fraud only to the extent that [they] are representative samples of the broader class of claims." *Id.* (internal citations omitted). Similarly, in *Kester v. Novartis Pharmaceuticals Corp.*, 23 F. Supp. 3d 242, 258 (S.D.N.Y. 2013), the Court held Plaintiffs to a "high degree of particularity" requiring the identification of "particular claims that are allegedly false" to "weed[] out" plaintiffs who are merely speculating that false claims might have been submitted." *Id.* at 256-57. Plaintiffs fall short of this requirement because the description of the conduct in their Complaint is not sufficiently detailed and they have not alleged even one particular example of the conduct alleged.

Generalized pleadings that allege misstatements took place on "occasions" not only "lack sufficient specificity" under Rule 9(b), but any argument that fraud claims exist which fail to "allege even a time frame" "much less the other more specific information" required by Rule 9(b) "would be

15

fruitless." *G-I Hldgs., Inc. v. Baron & Budd*, 238 F. Supp. 2d
521, 550 n.15, 552-53 (S.D.N.Y. 2002).

Finally, Plaintiffs' reliance on the May 20, 2015
disclosure notice in the antitrust settlement does not relieve
them of their obligation to allege the existence of a material
misstatement or omission with particularity. See *Estate of
Gottdiener v. Sater*, 35 F. Supp. 3d 386, 398 (S.D.N.Y. 2014). In
*Gottdiener*, The Honorable Lorna Schofield found that fraud
claims, although premised on a criminal guilty plea, were
nevertheless insufficiently particularized because they failed
to detail how the defendant allegedly defrauded the plaintiffs.
*Id.* The court identified the following deficiencies:

> · "It does not allege, for any particular stock,
> which of the Plaintiffs bought it, on what
> date, what misrepresentations or omissions [the
> broker] made to induce that purchase, whether
> that Plaintiff was fraudulently induced to
> continue to hold that stock, or what
> misstatement or omission was made at the time."
> *Id.*
>
> · "The Complaint uses the term 'Plaintiffs' or
> 'the Gottdieners' to refer to all four
> Plaintiffs, but this device does not excuse the
> required pleading." *Id.*
>
> · "The Complaint attaches the federal indictment
> containing the two counts to which [the broker]
> pleaded guilty . . . but neither document names

16

> any of the Plaintiffs to connect them to [the
> broker's] wrongdoing." *Id.*

The Complaint in this case has several of the same
deficiencies noted by the Court in *Gottdiener.* There are several
instances in which the Complaint does not distinguish between
the Plaintiffs (Compl. at ¶ 8), between the ISDAs (id. at ¶¶ 9-
11), and does not identify any particular trades at issue or how
the materiality of any misrepresentation would have caused
Plaintiffs to change their strategies (*id.* at ¶¶ 12-13). As in
*Gottdiener*, the disclosure Plaintiffs rely upon to shore up
their pleading deficiencies does not connect any particular one
of Plaintiffs' thousands of trades to the alleged wrongdoing
(*id.* at ¶¶ 25-29). Plaintiffs' allegation that they called
Defendant 150 times and spoke to an unidentified person does not
meet this burden (*id.* at ¶ 19).

Even if Plaintiffs could provide examples of the
alleged conduct and meet the particularity burden of Rule 9(b),
it has not been established that the failure to disclose a
markup constitutes a common law fraud claim. As counterparties
under the ISDAs, Citi was not prohibited from profiting on its
trading by way of a markup. The Complaint does not allege that
with respect to any of the thousands of unidentified trades,

17

Plaintiffs were overcharged, or that Plaintiffs did not receive exactly what they bargained for. Citi is not required to advise trading counterparties, to whom it owes no fiduciary duty, how it profits on a trade. See *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 482-83 (S.D.N.Y. 2013) (explaining that "commercial merchants generally are under no obligation to disclose their underlying costs or profits"); *Sebastian Hldgs., Inc. v. Deutsche Bank AG*, 78 A.D.3d 446, 447 (1st Dep't 2010) ("Plaintiff's alleged reliance on defendant's superior knowledge and expertise in connection with its foreign exchange trading account ignores the reality that the parties engaged in arm's-length transactions pursuant to contracts between sophisticated business entities that do not give rise to fiduciary duties.").

Further, there is no authority supporting a common law fraud claim for allegedly excessive broker markups even in the broker-dealer context. *Lehman Bros Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 167 (S.D.N.Y. 2001); see also *Granite Partners*, 58 F. Supp. 2d 228, 263 (S.D.N.Y. 1999). In *Lehman*, the Honorable John F. Keenan granted summary judgment dismissing markup claims in the same context alleged here: direct FX trading. The court rejected the plaintiffs' argument "that New York law recognizes a markup

18

fraud claim under a general theory of fraud liability based on omissions" relying upon the *Granite Partners* decision which "clearly held otherwise." *Id.*

**The Complaint Does Not Adequately Plead Scienter**

To state a fraud claim under New York law, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). To establish the requisite inference, a plaintiff must plead facts that: (i) "demonstrate the defendant's motive and opportunity to commit or assist in the fraud," or (ii) "constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness." *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 255 (S.D.N.Y. 2008) (citing *In re Parmalat Secs. Litig.*, 501 F. Supp. 2d 560, 573 (S.D.N.Y. 2007)).

While Plaintiffs allege a generalized profit motive (Compl. at ¶¶ 15-16), it does not create the requisite "strong inference" of fraudulent intent. See, e.g., *Chill v. G.E. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[t]he motive to maintain the appearance of corporate profitability, or of the success of an

19

investment, will naturally involve benefit to a corporation, but does not entail concrete benefits" sufficient to support a strong inference of fraudulent intent); *Friedman v. Ariz. World Nurseries Ltd. P'ship*, 730 F. Supp. 521, 532 (S.D.N.Y. 1990) (concluding it "would defy common sense" to find that the "scienter analysis would be satisfied merely by alleging the receipt of normal compensation for professional services rendered, because to do so would effectively abolish the requirement, as against professional defendants in a securities fraud action, of pleading facts which support a strong inference of scienter"), aff'd, 927 F.2d 594 (2d Cir. 1991).

   Plaintiffs allege that Defendant failed to execute transactions "for the sole reason that it was not going to realize a profit." (Compl. at ¶ 23.) But "[c]ourts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter." *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009); *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N.A. Holdings, Inc.*, No. 12 Civ. 4025 (AT), 2013 WL 6667601, at *19 (S.D.N.Y. Dec. 17, 2013) ("The complaint does not ascribe to the HSBC Defendants any particular motive for making these fraudulent representations

beyond a general profit motive common to all corporations, which does not suffice." (citing *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)). Plaintiffs' claim for scienter must be dismissed for the same deficiencies.

Here, the Complaint does not allege "conscious misbehavior or recklessness" by any individual at Citibank with whom Plaintiffs spoke. Plaintiffs have cited portions of Citigroup's May 20, 2015 disclosure notice, such as: "[W]ithout informing clients, worked limit orders at levels (i.e., prices) better than the limit order price so that we would earn a spread or markup in connection with our execution of such orders." (Plaintiffs' Rule 56.1 Statement ¶29; Halter Decl., Ex 2.) However, these sections of the disclosure notice lack factual allegations that link the disclosure notice to Plaintiffs' FX trading. Further, the disclosure notice did not explicitly state that Defendant's FX trading practices were "wrongful practices." Without concrete factual allegations of motive or conscious misbehavior, the Complaint fails under Rules 9(b) and 12(b)(6). See, e.g., *Thomas v. JPMorgan Chase & Co.*, 811 F. Supp.2d 781, 799 (S.D.N.Y. 2011) ("Plaintiffs fail to allege facts that show that 'defendants had both motive and opportunity to commit

fraud' or to point to any 'strong circumstantial evidence of conscious misbehavior.'").

**The Complaint Fails To Allege Reasonable Reliance**

New York law requires that Plaintiffs alleging common law fraud establish reasonable reliance on a material misrepresentation. In "assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

Courts impose enhanced duties on sophisticated parties before deeming their reliance reasonable. Courts recognize "an enhanced duty to obtain available information material to investment decisions," (*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 439 (S.D.N.Y. 2001)) and they have required a plaintiff to "show that he or she has made an independent inquiry into all available information." *Emergent Capital*, 165 F. Supp. 2d at 623. That is, "where parties have access to information that could expose a misrepresentation,

courts will not find their reliance sufficiently justifiable to merit legal protection." *Giannacopoulos v. Credit Suisse*, 37 F. Supp. 2d 626, 633 (S.D.N.Y. 1999).

In this case, the 2010 ISDA Agreement explicitly disclaims any reliance upon Citi. It provides "(1) No Reliance. Plaintiff is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary."

These types of contract provisions disclaiming reliance have been found enforceable under New York State law. "It is well settled that claims for fraud and negligent misrepresentation are barred where the party asserting the claim contractually agreed not to rely on the other party's representation." *JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, 29 Misc. 3d 1227(A), 920 N.Y.S.2d 241 at *7 (Sup. Ct. N.Y. Cty. 2010) (citing *Republic Nat'l Bank v. Hales*, 75 F Supp. 2d 300 (S.D.N.Y. 1999), aff'd, 4 F. App'x 15 (2d Cir. 2001)). Therefore, Plaintiffs fraud claim

fails for lack of reliance because they explicitly disclaimed
reliance in an enforceable provision of the ISDAs.

Further, Plaintiffs were a sophisticated counterparty
with access to vast amounts of information about the FX markets,
which contradicts their claim of reliance. As part of
Plaintiffs' billion dollar FX trading, Plaintiffs followed their
FX positions in real-time with up-to-the-second access to market
information (Compl. at ¶¶ 17-19). As such, Plaintiffs had no
right to rely upon the alleged unspecified statements that the
market had not reached the threshold of the Order (¶ 20). See
*Wang v. Bear Stearns Cos LLC*, 14 F. Supp. 3d 537, 546-47
(S.D.N.Y. 2014) (finding that the billionaire plaintiffs were
financially sophisticated, "given their business experience and
wealth," and therefore discounting claimed reliance on
information provided).

Plaintiffs also failed to allege any statements by the
Defendant on which they relied. Plaintiffs' allegation of
reliance merely asserted conclusory statements such as:
"Plaintiffs relied upon Citibank's representation in making
their trade instructions to Citibank." (Compl. at ¶ 70).
Plaintiffs allege that they spoke to unidentified Citibank

24

employees who made alleged misstatements at unidentified times. However, these allegations do not state sufficient detail to form the basis of reliance to survive a motion to dismiss. *Sazerac Co. v. Falk*, 861 F. Supp. 253, 260 (S.D.N.Y. 1994) ("the Complaint fails to articulate either when or to whom such representations were made, nor does it identify meetings or negotiations tying the Defendants to the alleged misrepresentations to [the plaintiff] or [a minority shareholder of defendant allegedly implicated in the fraud].").

For the reasons stated above, the fraud claim (Claim I) is dismissed for failure to plead reliance.

**The Complaint Does Not Allege Loss Causation**

The doctrine of loss causation applies to common law fraud claims such as the brought by Plaintiffs here as well as the more common loss causation claims in securities fraud cases. *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 346 (S.D.N.Y. 2013). Therefore, a plaintiff "must plead facts that indicate that the information concealed by the defendant['s] misrepresentations was the reason the transaction turned out to be a losing one." *Dexia SA/NV v. Bear, Stearns &*

*Co., Inc.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013). However, Plaintiffs have not alleged that they suffered any actual damages and that any part of their losses were caused by Defendants' purported misconduct.

The Complaint alleges that "[a]s a result of Citibank's fraud, Plaintiffs have been damaged in an amount to be determined at trial but at least equal to the amount of profit Citibank made from the undisclosed markups and the amount of profit Plaintiffs failed to realize from unexecuted and partially executed trades." (Compl. at ¶ 72.) This request for relief does not allege a category, or proportion, of Plaintiffs' claimed losses that are linked to any alleged misrepresentations. This type of pleading deficiency has been rejected by this Court. See *Dexia*, 929 F. Supp. 2d at 243 ("To prove loss causation, [a plaintiff] must plead facts that indicate that the information concealed by the defendant's misrepresentations was 'the reason the transaction turned out to be a losing one'") (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)).

As the Supreme Court stated in *Twombly*, "something beyond the mere possibility of loss causation must be

26

alleged. . . ." *Twombly*, 550 U.S. at 557-58. Here, the Complaint does not identify any loss caused by anything Citi did or failed to do.

Although the Plaintiffs seek to re-characterize their damages claims for "lost profits" and "lost opportunity to profit" as actual damages, in reality, the complaint only seeks lost profits.  See Compl. at ¶ 71-72, p. 13 at A (Prayer for Relief).

The Complaint pleads that: (i) "Plaintiffs lost the opportunity to profit from unexecuted or partially executed trades;" (ii) "Plaintiffs were not able to profit based on hundreds of unexecuted trades;" and (iii) Plaintiffs are entitled to damages in "the amount of profit Plaintiffs failed to realize from unexecuted and partially executed trades." (Compl. at ¶¶ 32, 71, 72.)

However, these alleged damages are all barred from recovery. This is because New York follows the "'out-of-pocket' rule, which limits the damages for fraud . . . to actual pecuniary loss, [and as such,] 'there can be no recovery of profits which would have been realized in the absence of fraud."

27

*Highland Capital Mgmt., L.P. v. Schneider*, 533 F. Supp. 2d 345, 357 (S.D.N.Y. 2008) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).

Courts have dismissed fraud claims where, as here, lost profits are the only damages sought, rather than the "actual pecuniary loss sustained as the direct result of the wrong." See, e.g., *Highland*, 533 F. Supp. 2d at 357 (where plaintiff "cannot allege any injury recoverable under a fraud claim" its "cause of action is dismissed"). In this case, there are no direct damages alleged and no damages directly resulted from the wrong. Plaintiffs were required to allege the out-of-pocket losses they had suffered and how they were linked to alleged misrepresentations, which Plaintiffs have failed to plead. *Spencer Trask Software & Info. Servs. LLC v. Rpost Int'l Ltd.*, 383 F. Supp. 2d 428, 455 (S.D.N.Y. 2003) ("At a minimum, the plaintiffs must make factual allegations describing the pecuniary or out-of-pocket loss sustained as a result of the defendants' alleged misrepresentations in order to maintain a claim for damages based upon fraud, and the plaintiffs in this case have failed to do so.").

28

For the reasons stated above, the fraud claim stated in Claim I is dismissed. This claim failed to plead: (1) with particularity under Rule 9(b); (2) scienter; (3) reasonable reliance; and (4) causation.

**The Breach of Contract Claim for Undisclosed Markups (Claim II) Fails to Adequately Plead the Provision Breached**

Plaintiffs bring three breach of contract claims for breaches of the ISDA Agreements. Claim II, which is based on undisclosed markups by the Defendant is dismissed because it fails to adequately plead the provision of the contract that was breached.

To state a claim for breach of contract, Plaintiffs must plead "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). On the other hand, "A breach of contract claim will be dismissed, however, as being too vague and indefinite, where the plaintiff fails to allege, in nonconclusory fashion, the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is

29

predicated." *Highlands Ins. Co. v. PRG Brokerage, Inc.*, No. 01 Civ. 2272 (GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) (quoting *Sud v. Sud*, 211 A.D.2d 423, 424 (1st Dep't 1995).

Plaintiff cites a Northern District of Texas case for the proposition that a plaintiff need not plead any specific provision breached in a contract claim. *Ricupito v. Indianapolis Life Ins. Co.*, No. 09-CV-2389-B, 2010 WL 3855293, at *6 (N.D. Tex. Sept. 30, 2010). However, that minority position has not been adopted by courts in the Second Circuit, which have held that plaintiffs must at least allege which agreement was breached and the relevant breached provisions of that contract. *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) ("a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue"), aff'd, 65 F. App'x. 736 (2d Cir. 2003).

This Court has found that a plaintiff does not meet the *Twombly-Iqbal* standard and must be dismissed when "the Complaint does not specify which clause of the Agreement Defendant is alleged to have breached" *Swan Media Group, Inc. v. Staub*, 841 F.Supp.2d 804, 807 (S.D.N.Y. 2002); see also *Spinelli v. Nat'l Football League*, 96 F.Supp.3d 81, 131 (S.D.N.Y. 2013).

30

Here, the ISDAs are not a completed agreement until the parties agree on the essential terms of each individual transaction. Halter Decl. Ex. 3 at 28 of 77 and Ex. 4 at 41 of 83. For Claim II there is no dispute that Plaintiffs have not identified even one example of a transaction in which Defendant charged a markup and have submitted no information about specific trade confirmations with the required essential terms which have been violated. These deficiencies bar the claims. *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002). While Plaintiffs make a conclusory allegation that they called Defendant to contest issues with markups (Compl. at ¶¶ 19-20), this allegation lacks sufficient factual detail and the existence of a particular contract term to survive a motion to dismiss. *Barclays Bank Mexico, S.A. v. URBI*, 40 Misc. 3d 1212(A), 975 N.Y.S.2d 707 (Sup. Ct. N.Y. Cty. 2013).

For the reasons stated above, the breach of contract claim for undisclosed markups in Claim II is dismissed. This claim failed to plead the essential terms of the alleged agreement between the parties and which provisions, if any, were breached.

31

**Breach of Contract for Cancellation of the €5,000,000 Order
Based on an Erroneous Margin Call (Claim III) Is Dismissed for
Failure to Adequately Allege Damages**

Claim III alleges that as a result of the December 2,
2014 margin call, Defendant breached the ISDAs by
inappropriately canceling Plaintiffs' FX order for €5,000,000
from the last week of November 2014.

To state a valid claim for breach, Plaintiffs must
allege valid damages. *Fischer & Mandell, LLP v. Citibank, N.A.*,
632 F.3d at 799 (2d Cir. 2011). For Claim III, Plaintiffs seek
"actual damages" for "losses and lost profits resulting from"
the unexecuted trade. (Compl. page 13, ¶ B.) However, lost
profits are explicitly prohibited from the 2010 ISDA, which
provides "[n]o party shall be required to pay or be liable to
the other party for any consequential, indirect or punitive
damages, opportunity costs or lost profits." In this case, there
are no losses alleged other than lost profits. Further, the 2010
ISDA specifically contemplates that it will control "all
Transactions entered into (whether before or after this
Agreement is entered into)."

32

Contractual limitation of liability provisions such as these are enforceable. See, e.g., *Deutsche Lufthansa AG v. Boeing Co.*, No. 06 Civ. 7667 (LBS), 2007 WL 403301, at *2 (S.D.N.Y. Feb. 2, 2007) ("The New York Court of Appeals has held that a limitation on liability provision in a contract represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." (alteration omitted and quoting *Metro. Life Ins. Co. v. Nobel Lowndes Int'l Inc.*, 84 N.Y.2d 430, 435, 618 N.Y.S.2d 882, 885 (1994))); *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 434 (S.D.N.Y. 2004) ("the clause clearly evidences an intention to limit plaintiff's liability for lost profits.").

Therefore, the limitation of liability provision of the 2010 ISDA precludes exactly the losses that Plaintiffs seek and is fully enforceable.

Plaintiffs also allege that had the December 2014 Order "been executed on December 17, 2014, it would have resulted in at least $700,000 in profit to Plaintiffs." Compl. at ¶¶ 58, 84. While the Complaint does not describe how

33

Plaintiffs calculated this figure, it surely is a measure of lost profits -- which is prohibited under the limitations of liability provision of the 2010 ISDA.

Plaintiffs claim that this damages limitation provision is only in the 2010 ISDA, not the 2007 ISDA.  However, the December 2, 2014 margin call was governed by the 2010 ISDA. Further, Plaintiffs argue that the 2010 ISDA only applied to Gervasio Negrete and not Eduardo Negrete, who never signed the 2010 ISDA. This argument is unavailing since the December 2, 2014 margin call was governed by the 2010 ISDA.

For the reasons stated above, the breach of contract claim for the December 2014 margin call and cancellation of the €5,000,000 order in Claim III is dismissed for failure to plead any valid damages.

**The Breach of Contract Claim for Erroneous Margin Calls (Claim V) Fails to Adequately Plead the Provision Breached**

Claim V alleged that Defendant calculated and initiated incorrect margin calls on "numerous" occasions. Like in Claim II, these claims lack the specificity about the

34

provisions of the contract about margin calls that were violated to survive the motion to dismiss. *Highlands Ins. Co. v. PRG Brokerage, Inc.*, No. 01 Civ. 2272 (GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) ("A breach of contract claim will be dismissed, however, as being too vague and indefinite, where the plaintiff fails to allege, in nonconclusory fashion, the essential terms of the parties' purported contract"). In this claim, the Complaint fails to plead basic facts about which provisions these margin calls violated. With the exception of several margin calls in December 2014, most of these "numerous" margin calls do not include the dates on which they allegedly occurred.

Further, Plaintiffs failed to use the required dispute resolution provision to contest margin calls under the ISDAs, which invalidates the claims of invalid margin calls. Such dispute resolution provisions for ISDAs have been held enforceable. *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, No. 08 Civ. 1563 (BSJ), 2009 WL 311362, at *2 (S.D.N.Y. Jan. 29, 2009). The ISDAs here state that a party disputing "the Value of any Transfer of Eligible Credit Support or Posted Credit Support must notify the other party by the close of business on the Local Business Day following the date

35

on which the demand is made." (ISDA Amendment No. 3, p.3, ¶5.)
In this case, Plaintiffs did not allege that they contested
these disputed margin calls by the following business day using
the required dispute resolution procedure. Therefore, Claim V
for inappropriate margin calls is dismissed.

**The Allegations of Breach of the Covenant of Good Faith and Fair Dealing Are Dismissed**

In the sections of the Complaint regarding each of the
three breach of contract claims, Plaintiffs also alleged that
Citibank breached the implied covenant of good faith and fair
dealing. (Compl. at ¶¶ 78, 85, 99). In New York, this covenant
applies to all contracts. *Chase Manhattan Bank v. Keystone
Distribs. Inc.,* 873 F.Supp. 808, 815 (S.D.N.Y. 1994). These
implied covenants may be subject to dismissal if they are based
on the same facts and express contract provisions as a
substantive claim. *Ret. Bd. Of Policemen's Annuity & Ben. Fund
of City of Chicago v. Bank of New York Mellon*, No. 11 Civ. 5459
(WHP), 2014 WL 3858469, at *3 (S.D.N.Y. July 30, 2014). However,
"a party may be in breach of its implied duty of good faith and
fair dealing even if it is not in breach of its express

36

contractual obligations." *Chase Manhattan Bank,* 873 F.Supp. at
815.

An implied covenant does not independently create
additional duties extraneous to the parties' agreements. See,
e.g., *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d
Cir. 2005) ("The implied covenant can only impose an obligation
consistent with other mutually agreed upon terms in the
contract. It does not add to the contract a substantive
provision not included by the parties").

Here, the breach of the implied covenant of good faith
and fair dealing claim (Compl. at ¶¶ 78, 85, 99), relies on no
facts distinct from the breach of contract claims (see id. at ¶¶
73, 80, 92). An implied covenant claim "will not stand if it is
duplicative of a breach of contract claim" and, accordingly, in
this case there is no additional contract claim under the
implied covenant of good faith and fair dealing that survives
the motion to dismiss. See, e.g., *Harris v. Provident Life &
Accident Ins.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . .
. does not recognize a separate cause of action for breach of
the implied covenant of good faith and fair dealing when a

37

breach of contract claim, based upon the same facts, is also
pled.").

The motion to dismiss the claims for the implied
covenant of good faith and fair dealing with respect to the
Second, Third, and Fifth Claims is granted on the basis of the
authorities set forth above.

**The Claims for Negligence (Claims IV and VI) Are Dismissed for
Failure to Adequately Allege an Independent Duty**

In addition to the breach of contract claims for
impermissible margin calls (Claims III and V), Plaintiffs bring
two claims for negligence for the same impermissible margin
calls. For the reasons described below, these claims are also
dismissed.

To recover for negligence "New York courts require a
plaintiff to show: (1) that the defendant owed the plaintiff a
cognizable duty of care, (2) that the defendant breached that
duty, and (3) that the plaintiff suffered damages as a proximate
result of that breach." *King v. Crossland Sav. Bank*, 111 F.3d
251, 255 (2d Cir. 1997). New York courts have held that "a

38

simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190 (1987). This independent legal duty "must spring from circumstances extraneous to" the contract. *Id.*

The fourth and sixth claims for negligence (Compl. at ¶¶ 87-91, 101-105), plead that Defendant had four duties separate and apart from the ISDAs that were breached as a result of Defendant's negligence and caused damages. These duties included duties: (1) to act on Plaintiffs' instructions to execute certain trades; (2) to provide Plaintiffs with accurate information; (3) to properly calculate collateral for margin calls; and (4) to only make margin calls when appropriate.

However, all four of these duties emanated from the ISDA agreements. These alleged duties are not distinct or independent from the Complaint's contract claims. *Clark-Fitzpatrick*, 70 N.Y.2d at 389. In fact, these duties turn on identical duties to "monitor the value of Plaintiffs' accounts accurately and make margin calls only when appropriate" and "properly calculate Plaintiffs' collateral and execute

39

appropriate margin calls." (Compare Compl. at ¶¶ 82-86 with
Compl. at ¶¶ 87-91.) Here, the duties which Defendant allegedly
performed negligently are the same duties Plaintiffs claim
Defendant was contractually obligated to perform under the
ISDAs.

Plaintiffs argue that they were at an information
deficit to Defendants and therefore would not have had the
information necessary to know why Defendant incorrectly
calculated their collateral for margin calls. However,
Plaintiffs do not dispute that they were notified of each margin
call and could have used the dispute resolution mechanism in the
ISDAs to challenge any incorrect margin call. (Compl. at ¶¶ 87-
91, 101-105.) Plaintiffs also could have asked for more
information about how the margin calls were being calculated
within the one business day window as required by the contract.

In contexts such as these, "courts have found that in
actions involving the contractual duties of corporations and
financial institutions, a negligence action may not be
maintained and parties must proceed under a contract theory."
*Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 670
(S.D.N.Y. 2008) (holding that "DBSI had no professional or

40

otherwise special relationship with Sagebrush such that a tort-based duty independent of the parties' contract arose." (internal citations omitted)); see also *THC Holdings Corp. v. Tishman*, Nos. 93 Civ. 5393, 95 Civ. 4422 (KMW), 1998 WL 305639, at *4 (S.D.N.Y. June 9, 1998) (failing to find any tort-based duty of care between investment bank and client). As noted above, there is no fiduciary or other special relationship between the Negretes and Citibank, as is expressly noted in the ISDAs, which further substantiates why the negligence claims here fail.

Further, Plaintiffs' negligence claims are foreclosed under the economic loss doctrine, which precludes parties from improperly attempting to convert contract claims to tort claims seeking the same damages. *Travelers Cas. and Sur. Co. v. Dormitory Authority-State of New York*, 734 F.Supp.2d 368, 379 (S.D.N.Y. 2010). When Plaintiffs, as is the case here, allege economic loss as an injury in a tort claim "the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie." *In re Adelphia Communications Corp.*, No. 02-41729, 2007 WL 2403553, at *9 (Bankr. S.D.N.Y. Aug. 17, 2007); see also *BNP Paribas*, 949 F. Supp. 2d 486, 505 (S.D.N.Y. 2013). The purpose of this economic loss rule is to

41

"keep contract law from drowning in a sea of tort and with this goal in mind New York courts restrict plaintiffs who have suffered economic loss, but not personal or property injury, to an action for the benefits of their bargains." *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007) (quotation marks and citations omitted).

Plaintiffs argue that the damages for their negligence claims are distinct from those of the contract claims. For example, Plaintiffs closed positions they would have kept open in order to cover the margin calls and Defendant cancelled profitable trades as a result of the margin calls. However, these are damages pled in the contract claims. For example, Claim V for breach of contract in ¶ 98 of the Complaint alleges that "Citibank also breached the ISDA Agreements by cancelling Plaintiffs' instructions due to those erroneous margin calls." The allegations about closing positions are not contained in a section on negligence. Both ¶ 65 and page 13, which are the two references to Plaintiffs suffering damages from closing positions to cover margin calls, are not related to any particular claim and likely were intended to apply to both the breach of contract and negligence claims since they were in a

42

generic factual section on "Miscalculated Collateral," which is
the basis for both the contract and negligence claims. There are
no alleged negligence damages that are distinct from the
contract claims.

For the reasons stated above, the negligence claims in
Claim IV and Claim VI are dismissed for failure to state an
independent legal duty and failure to plead sufficient damages
for negligence claims under the economic loss doctrine. *Taylor
v. T-Mobile USA, Inc.*, No. 14 Civ. 4965 (LTS), 2015 WL 223782,
at *4 (S.D.N.Y. Jan. 16, 2015) ("Plaintiff's negligence claim is
barred by New York's economic-loss doctrine, which recognizes
that any damages arising from the failure of the bargained-for
consideration to meet the expectations of the parties are
recoverable in contract, not tort, unless a legal duty
independent of the contract itself has been violated") (internal
citations omitted).

**The Cross-Motion for Partial Summary Judgment is Denied**

The Plaintiffs have sought partial summary judgment on
their second claim for breach of contract for the undisclosed
markups. Plaintiffs seek to rely on Defendant's admissions in

43

the unrelated antitrust plea agreement and required disclosures as proof of liability under the breach of contract claim for markups. This contention has been rejected as set forth in the above section dismissing Claim II. Therefore, partial summary judgment on the second claim is denied.

**Conclusion**

Upon the conclusions set forth above, the motion of the Defendant to dismiss the Complaint is granted without prejudice and with leave to amend, and the cross-motion of the Plaintiffs for partial summary judgment for breach of contract is denied.

It is so ordered.

**New York, NY**
**May /9, 2016**

ROBERT W. SWEET
U.S.D.J.

44