UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

EDUARDO NEGRETE AND GERVASIO NEGRETE,

                    Plaintiffs,            15 Civ. 7250

    -against-                           OPINION

CITIBANK, N.A.,

                    Defendant.

-----------------------------------------X

A P P E A R A N C E S:

### Attorneys for Plaintiffs

LIDDLE & ROBINSON, LLP
800 Third Avenue
New York, NY 10022
By:  Blaine H. Bortnick, Esq.
     James W. Halter, Esq.
     Read K. McCaffrey, Esq.
     Atoosa Esmaili, Esq.

### Attorneys for Defendant

GOODWIN PROCTER, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
By:  Marshall H. Fishman, Esq.
     Samuel J. Rubin, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/27/17

**Sweet, D.J.**

Defendant Citibank, N.A. ("Citi" or "Defendant") has moved pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6) to dismiss the amended complaint (the "First Amended Complaint" or "FAC") filed by Eduardo Negrete and Gervasio Negrete (the "Negretes" or "Plaintiffs"). The Plaintiffs have cross-moved pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment for breach of contract. Upon the facts and conclusions set forth below, the motion of Citi to dismiss is granted in part and denied in part, and the cross-motion of the Negretes for partial summary judgment is denied.

**Prior Proceedings**

The Plaintiffs filed their complaint (the "Complaint" or "Compl.") on September 16, 2015. The Complaint alleged that Citibank defrauded the Negretes and breached certain contracts that were memorialized by International Swaps and Derivatives Association ("ISDA") Master Agreements for foreign exchange ("FX") transactions. (Compl. at ¶ 5, 6). The Complaint alleged millions of dollars in lost profits because Defendant had

1

charged undisclosed markups for certain transactions with the Plaintiffs.

The Complaint was dismissed, and Plaintiffs' motion for partial summary judgment was denied in a May 19, 2016 opinion. That Court dismissed the fraud claims because they failed to plead: (1) with particularity under Rule 9(b); (2) scienter; (3) reasonable reliance; and (4) loss causation. The breach of contract claims for markups were dismissed because they failed to plead the essential terms of the alleged agreement between the parties, and there were no individual transactions pled in the Complaint. The claims for breach of contract for inappropriate margin calls were dismissed because the damages sought were lost profits, and lost profits were excluded under the terms of the ISDAs. The partial summary judgment motion for markups was dismissed for the same reasons as the breach of contract claim. The complaint was dismissed in its entirety with leave to replead.

Plaintiff filed the FAC on June 20, 2016. The FAC included over 35 specific allegations of breaches and fraudulent conduct. The claims were fraud, fraudulent misrepresentations, and breach of contract. The Defendant's motions to dismiss and

2

the Plaintiffs' cross-motion for partial summary judgment were
both filed on July 27, 2016.  Defendant's motion and the
Plaintiffs' cross-motion for partial summary judgment were both
heard and marked fully submitted on October 27, 2016.

**The Facts**

The parties have established certain allegations pled
in the FAC as well as statements of fact pursuant to Federal
Rule of Civil Procedure 56.1.

**The Allegations in the FAC**

The allegations in the FAC describe over 35 different
transactions demonstrating allegedly fraudulent conduct, which
are also in breach of the ISDAs.  These allegations include
markups and claims that Defendant failed to execute certain
trades.  Plaintiffs provided 22 examples of markups in which
Defendant traded with Plaintiffs for the exact price at which
they agreed even though Defendant could have obtained a better
price.  FAC at ¶¶ 35-56.  Further, Plaintiffs allege that on at
least five occasions, Defendant did not execute on certain

3

trades even though the market reached the threshold of
Plaintiffs' limit orders.  FAC at ¶¶ 71-75.

On another 10 occasions, Plaintiffs allege that
Defendant only partially executed certain trades, even though
the market reached the threshold of Plaintiffs' orders.  FAC at
¶¶ 83-92.  One example is that Plaintiffs placed an order for
$10,000,000 of Mexican Pesos at a certain level, but Defendant
only filled $1,000,000 of the trade.  FAC at ¶ 87.  For nine of
the 10 trades that were partially executed, the damages alleged
are the markup between the agreed price and the best available
price.  FAC at ¶¶ 83-92.  However, one trade alleges damages
because Plaintiffs were forced to complete the trade at a less
advantageous price than the agreed upon price in order to
complete the partially executed transaction.  FAC at ¶ 83.

**The Statements of Material Facts Pursuant to Rule 56.1**

The facts relating to the cross motion for summary
judgment are set forth in the Plaintiffs' Statement pursuant to
Local Rule 56.1, and the Defendant's Counterstatement in
Opposition to Plaintiffs' Rule 56.1 Statement and are not in
dispute except as noted below.

4

Plaintiffs Eduardo and Gervasio Negrete are Mexican citizens, who maintained several bank accounts with Defendant Citibank.  Plaintiffs' 56.1 Statement at ¶¶ 1-3.  The parties entered into an ISDA Master Agreement on October 30, 2007 (the "2007 ISDA"), as well as a Schedule to that Agreement, a Security Agreement, and an addendum to the Security Agreement, which were all dated October 30, 2007.  Plaintiffs' 56.1 Statement at ¶¶ 4-7.  The parties entered into Amendment No. 1 to the 2007 ISDA on December 5, 2008, Amendment No. 2 on December 5, 2008, and Amendment No. 3 on March 5, 2014.  Plaintiffs' 56.1 Statement at ¶¶ 8-10.  Plaintiffs and Partizan S.A. de CV entered into a Credit Support Annex to the 2007 ISDA with Defendant dated March 5, 2014.  Plaintiffs' 56.1 Statement at ¶ 11.

Plaintiff Gervasio Negrete entered into an ISDA Master Agreement with Defendant dated August 13, 2010 (the "2010 ISDA"), as well as a Schedule to that Agreement and a Credit Support Annex, both dated August 13, 2010.  Plaintiffs' 56.1 Statement at ¶¶ 12-14.  Plaintiff Gervasio Negrete entered into Amendment No. 1 to the 2010 ISDA with Defendant on May 17, 2013.  Plaintiffs' 56.1 Statement at ¶ 15.  Plaintiff Gervasio Negrete

and Partizan S.A. de CV entered into a Credit Support Annex to
the 2010 ISDA with Defendant on May 17, 2013. Plaintiffs' 56.1
Statement at ¶ 16.

The parties dispute when a contract was formed.
Plaintiffs assert that the ISDAs state: "The parties hereto
agree that with respect to each Transaction hereunder a legally
binding agreement shall exist from the moment that the parties
hereto agree on the essential terms of such Transaction, which
the parties anticipate will occur by telephone." Slipp Decl.,
Ex. A at 28 of 77 (Part 5(1)(a)) and Ex. B at 41 of 83 (Part
5(c)(1)).

However, Defendant asserts that the ISDAs also state:
"For each Transaction Party A [Defendant] and Party B
[Plaintiffs] agree to enter into hereunder, Party A shall
promptly send to Party B a Confirmation setting forth the terms
of such Transaction. Party B shall execute and return the
Confirmation to Party A or request correction of any error
within three Business Days of receipt except in the case of
Transactions covered by Part 6, in which case the Confirmations
will be deemed to be correct unless Party B notifies Party A or
an error within three Business Days of receipt. Failure of

6

Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of such terms." Slipp Decl., Ex. A at 28-29 of 77 (Part 5(1)(b)) and Ex. B at 41 of 83 (Part 5(c)(2) (there is one difference between the two ISDAs for this passage, which is that Ex. B allows for a period of ten days for the exception of transactions covered by Part 6 and Ex. A only allows for three days for the same transactions. The text from Ex. A is quoted above.)).

While Plaintiffs assert that pursuant to the ISDAs, Plaintiffs instructed Citibank to execute thousands of transactions, sometimes as many as 10-15 per day, Defendant disputes that Plaintiffs have not supported these estimates with any admissible evidence relating to the total number and frequency of trades. Plaintiffs' 56.1 Statement at ¶ 19; Defendants' 56.1 Counterstatement at ¶ 19.

While Plaintiffs assert that the total value of the FX trades was approximately $15 billion per year, Defendant disputes that Plaintiffs have not supported this estimate with any admissible evidence. Plaintiffs' 56.1 Statement at ¶ 20; Defendants' 56.1 Counterstatement at ¶ 20.

Plaintiffs assert that the ISDAs do not reference any markup or commission on the FX trades, however Defendant disputes this characterization and refers to the ISDA Agreements for the context and complete content of their terms. Plaintiffs' 56.1 Statement at ¶ 21; Defendants' 56.1 Counterstatement at ¶ 21.  Plaintiffs also assert that Defendant never informed Plaintiffs that it was "marking-up" Plaintiffs' trade instructions or that Defendant was taking any commission. Plaintiffs' 56.1 Statement at ¶ 22.  However, Defendant disputes that these statements are supported by admissible evidence and further asserts that Plaintiffs were aware Defendant was not transacting free of charge and that Defendant would try to make a profit on trades.  Defendants' 56.1 Counterstatement at ¶ 22.

Plaintiffs assert that Defendant never told Plaintiffs that Defendant would only execute their transactions if it could achieve a markup, however Defendant disputes this statement because it is not supported by admissible evidence and because Defendant asserts that Plaintiffs were aware that Defendant would try to make a profit on the trades.  Plaintiffs' 56.1 Statement at ¶ 23; Defendants' 56.1 Counterstatement at ¶ 23.

8

Plaintiffs assert that they performed all of their obligations under the ISDA Agreements, however Defendant disputes that there is any evidentiary support for this position. Plaintiffs' 56.1 Statement at ¶ 24; Defendants' 56.1 Counterstatement at ¶ 24.

Plaintiffs assert that on approximately May 20, 2015, Citicorp, an affiliate of Defendant, agreed to plead guilty to one count of conspiring to rig bids in the FX Spot Market between December 2007 and January 2013 in violation of the Sherman Antitrust Act. Plaintiffs' 56.1 Statement at ¶ 25. Defendant disputes that this fact is material because the violation in that case is not at issue in this case and there are no antitrust claims in this case. Defendants' 56.1 Counterstatement at ¶ 25.

Plaintiffs assert that this plea agreement stated that Citicorp "through its currency traders and sales staff, also engaged in other currency trading and sales practices in conducting FX Spot Market transactions with customers via telephone, email, and/or electronic chat, to wit: (i) intentionally working customers' limit orders one or more levels, or 'pips,' away from the price confirmed with the

9

customer; (ii) including sales markup, through the use of live hand signals or undisclosed prior internal arrangements or communications, to prices given to customers that communicated with sales staff on open phone lines; (iii) accepting limit orders from customers and then informing those customers that their orders could not be filled, in whole or in part, when in fact the defendant was able to fill the order but decided not to do so because the defendant expected it would be more profitable not to do so; and (iv) disclosing non-public information regarding the identity and trading activity of the defendant's customers to other banks or other market participants, in order to generate revenue for the defendant at the expense of its customers." Halter Decl., Ex. 1 at ¶ 13. However, Defendant disputes this statement because it is immaterial and misleading in that it suggests a nexus with this case despite the fact that Plaintiffs have not shown the relevance or connection between this statement and this case. Defendants' 56.1 Counterstatement at ¶ 26.

Plaintiffs assert that the United States Department of Justice ("DOJ") required that Citibank disclose the conduct described in paragraph 26 to its customers. (Halter Decl., Ex. 1 at ¶¶ 9(c)(i) and 13 and Ex. 2 ("DOJ Required Disclosure")).

10

Defendant disputes that this statement is material and asserts that the statement is misleading in that it suggests a nexus with the instant case, when the statement is not relevant to the present facts. Defendants' 56.1 Counterstatement at ¶ 27.

Plaintiff asserts that the DOJ also required that, "The defendant shall implement and shall continue to implement a compliance program designed to prevent and detect the conduct set forth in Paragraph 4 (g)-(i) above and, absent appropriate disclosure, the conduct in Paragraph 13 below . . . ." (Halter Decl., Ex. 1 at 9(c)(iii)). Defendant disputes that this statement is material and asserts that the statement is misleading in that it suggests a nexus with the instant case, when the statement is not relevant to the present facts. Defendants' 56.1 Counterstatement at ¶ 28.

Plaintiff asserts that Citibank "without informing clients, worked limit orders at levels (i.e., prices) better than the limit order price so that we would earn a spread or markup in connection with our execution of such orders. This practice could have impacted clients in the following ways: (1) clients' limit orders would be filled at a time later than when the Firm could have obtained currency in the market at the limit

11

orders' prices, and (2) clients' limit orders would not be
filled at all, even though the Firm had or could have obtained
currency in the market at the limit orders' prices. For example,
if [Citi] accepted an order to purchase €100 at a limit of
1.1200 EURUSD, we might choose to try to purchase the currency
at a EURUSD rate of 1.1199 or better so that, when we sought in
turn to fill the client's order at the order price (i.e.,
1.1200), we would make a spread or markup of 1 pip or better on
the transaction. If the Firm were unable to obtain the currency
at the 1.1199 price, the clients' order may not be filled as a
result of our choice to make this spread or markup." Halter
Decl. Ex. 2.  Defendant disputes that this statement is material
and asserts that the statement is misleading in that it suggests
a nexus with the instant case, when the statement is not
relevant to the present facts.  Defendants' 56.1
Counterstatement at ¶ 29.

Plaintiffs assert that the practices described in
paragraph 29 of their Rule 56.1 Statement were done with respect
to at least some of Plaintiffs' orders pursuant to the ISDAs
without their knowledge, including Plaintiff Gervasio Negrete's
September 14, 2011 EURUSD trade instruction described in
paragraph 16 of his declaration and the Plaintiffs' November 15,

12

2011 AUDUSD trade instruction described in paragraph 17 of
Gervasio Negrete's declaration. Negrete Decl. at ¶¶ 15-17.
Defendant disputes whether this assertion is supported by
admissible evidence, describes a breach of the ISDAs, and
whether it is consistent with the Court's May 19, 2016 opinion,
which concluded that the parties had a counterparty relationship
as principals -- not fiduciaries. Defendants' 56.1
Counterstatement at ¶ 30.

Plaintiff asserts that Citibank "made decisions not to
fill clients' limit orders at all, or to fill them only in part,
in order to profit from a spread or markup in connection with
[Citi's] execution of such orders. For example, if [Citi]
accepted a limit order to purchase €100 at a EURUSD rate of
1.1200, [Citi] would in certain instances only partially fill
the order (e.g., €70) even when [Citi] had obtained (or might
have been able to obtain) the full €100 at a EURUSD rate of
1.1200 or better in the marketplace. [Citi] did so because of
other anticipated client demand, liquidity, a decision by the
Firm to keep inventory at a more advantageous price to the Firm,
or for other reasons. In doing so, [Citi] did not inform [its]
clients as to [its] reasons for not filling the entirety of
their orders." Halter Decl. Ex. 2. Defendant disputes that

13

this statement is material and asserts that the statement is
misleading in that it suggests a nexus with the instant case,
when the statement is not relevant to the present facts.
Defendants' 56.1 Counterstatement at ¶ 31. Defendant further
disputes whether this statement is consistent with the Court's
May 19, 2016 opinion, which concluded that the parties had a
counterparty relationship as principals -- not fiduciaries.
Defendants' 56.1 Counterstatement at ¶ 31.

Plaintiff asserts that the practices described in
Paragraph 31 of the Rule 56.1 Statement of Material facts were
done with respect to some of the Plaintiffs' orders pursuant to
the ISDAs without their knowledge, including Plaintiff Gervasio
Negrete's September 14, 2011 EURUSD trade and the November 15,
2011 AUDUSD, both described in Gervasio Negrete's Declaration.
Negrete Decl. at ¶¶ 13, 15-17. Defendant disputes that this
statement is a vague conclusion that is not disputed by
admissible evidence and because the transactions mentioned in
the Negrete Declaration do not describe breaches of the ISDAs.
Defendants' 56.1 Counterstatement at ¶ 32. Defendant further
disputes whether this statement is consistent with the Court's
May 19, 2016 opinion, which concluded that the parties had a

counterparty relationship as principals -- not fiduciaries.
Defendants' 56.1 Counterstatement at ¶ 32.

Plaintiffs assert that on June 23, 2015, they met with
Rodrigo Curiel, their banker at Citibank, to discuss the DOJ
Required Disclosure. Plaintiffs assert that during that
meeting, Mr. Curiel stated, in sum and substance, "I feel very
bad about lying to you two. I was ordered by my superiors at
Citibank to add a markup to all of your orders. I was also
instructed that I could not let you know about the markups.
That is why, when you complained about orders not being filled,
I had to come up with some excuses, without revealing the real
reason your orders were not filled as instructed." Negrete
Decl. at ¶ 12. Defendant disputes this statement because it is
inadmissible hearsay under Federal Rule of Evidence 805 and is
irrelevant to the breach of contract claim, which is the only
subject of the partial motion for summary judgment. Defendants'
56.1 Counterstatement at ¶ 33.

Plaintiffs further assert that Mr. Curiel stated to
Plaintiffs on June 23, 2015, in sum and substance, that "on some
occasions, the traders that were acting on our FX instructions
had added an additional undisclosed markup, on top of the

15

undisclosed markup added by the desk and that the only way to
know exactly how much money Citibank had taken from us was to
request the following from Citibank: the Client Price, the
Trader Price, and the Sales Trader Price, and that the
difference between the three was how much Citibank took from
us." Negrete Decl. at ¶ 13. Defendant disputes this statement
because it is inadmissible hearsay under Federal Rule of
Evidence 805 and is irrelevant to the breach of contract claim,
which is the only subject of the partial motion for summary
judgment. Defendants' 56.1 Counterstatement at ¶ 34.

**The Applicable Standards**

On a motion to dismiss pursuant to Rule 12(b)(6), all
factual allegations in the complaint are accepted as true, and
all inferences are drawn in favor of the pleader. *Mills v.
Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). A
complaint must contain "sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its
face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955,
1964, 167 L. Ed. 2d 929 (2007)). A claim is facially plausible
when "the plaintiff pleads factual content that allows the court

16

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (quoting *Twombly*, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

Additionally, while "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" *Munoz-Nagel v. Guess, Inc.*, No. 12-1312, 2013 WL 1809772, *3 (S.D.N.Y. Apr. 30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); *Williams v. Calderoni*, No. 11-3020, 2012 WL 691832, *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (citation and internal quotation omitted).

17

Allegations of fraud, must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud." Fed. R. Civ. 9(b). Under Rule 9(b), the complaint must: (i) "specify the statements that the plaintiff contends were fraudulent," (ii) "identify the speaker," (iii) "state where and when the statements were made, and" (iv) "explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3ed 273, 290 (2d Cir. 2006) (quotations and citations omitted); *Vista Food Exch. Inc. v. Champion Foodservice, LLC*, No. 14 Civ. 804, 2015 WL 5000863, at *9 (S.D.N.Y. Aug. 18, 2015) (same and further holding that "Rule 9(b) pleadings cannot be based on information and belief" (citing *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972))).

As the Second Circuit has recognized that the elements of a fraud claim under New York law are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *May Dept. Stores Co. v. International Leasing Corp., Inc.*, 1 F.3d 138, 1 (2d Cir. 1993).

18

Summary judgment is appropriate only where "there is
no genuine issue as to any material fact and ... the moving
party is entitled to a judgment as a matter of law." Fed. R.
Civ. P. 56(c). A dispute is "genuine" if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986). The relevant inquiry on application for summary
judgment is "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law." *Id.*
at 251-52. A court is not charged with weighing the evidence
and determining its truth, but with determining whether there is
a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y.
City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990)
(quoting *Anderson*, 477 U.S. at 249). "[T]he mere existence of
some alleged factual dispute between the parties will not defeat
an otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material fact."
*Anderson*, 477 U.S. at 247-48 (emphasis in original).

**The Motion to Dismiss the Fraud Claim and Claim for Fraudulent
Misrepresentations (Claims I and II) Regarding Markups Is
Granted Because Plaintiffs Fail to Adequately Allege the
Particularity Required by Rule 9(b)**

19

The fraud claims in the previous Complaint were dismissed because Plaintiffs failed to plead with sufficient particularity to survive a motion to dismiss under Rule 9(b). While in the original Complaint Plaintiff did not include any instances of the fraudulent conduct, the FAC includes over 35 examples of the allegedly fraudulent conduct.  However, Plaintiffs here have not pled that they suffered from this conduct with the required particularity to satisfy Rule 9(b). For the reasons stated below, the Defendant's motion to dismiss is granted.

As discussed in the Court's May 19, 2016 opinion, the Second Circuit has held that the particularity requirement of Rule 9(b) requires that "the complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992).

Plaintiffs' argue that they have cured the deficiencies with Rule 9(b) by alleging over 35 specific instances of allegedly fraudulent conduct.  However, Plaintiffs

fraud allegations fail because Plaintiffs "still have not linked the alleged fraudulent statements to particular Directors. Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to defendants." *Mills v. Polar Molecular Corp.*, 12 F.3d at 1175 (internal citations omitted). Here, Plaintiffs vaguely link allegedly fraudulent statements to an "unknown Citibank employee" in each of their examples of the fraudulent conduct. While "courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct" when it takes place thousands of times over a multi-year period (*United States v. Wells Fargo Bank, N.A.*, 972 F.Supp.2d 593, 616 (S.D.N.Y. 2013)), likewise Plaintiffs must "identify those responsible for the statements." *McLaughlin v. Anderson*, 962 F.2d at 191. Here, Plaintiffs do not meet the particularity requirements of Rule 9(b) because they fail to identify the alleged Citibank employees who made these allegedly fraudulent statements.

Even if these allegations about unknown Citibank employees were sufficient, Plaintiffs failed to address the holding that even if there were adequate examples of fraudulent conduct, failure to disclose a markup, without more, does not constitute a common law fraud claim. *Negrete v. Citibank*, 187

21

F.Supp.3d 454, 464 (S.D.N.Y. 2016). As counterparties under the ISDAs, Citi was not prohibited from profiting on its trading by way of a markup. The FAC does not allege that with respect to any of the trades, Plaintiffs were overcharged, or that Plaintiffs did not receive exactly what they bargained for. The issue raised with respect to markups is that Defendant did not provide Plaintiff with the best available price. However, Defendant had no fiduciary obligation to provide Plaintiffs with best execution because the Negretes were not a client; Citibank and the Negretes were both principals. *Geman v. S.E.C.*, 334 F.3d 1183, 1186 n.4 (10th Cir. 2003).

As noted in the May 19, 2016 opinion, Citibank is not required to advise trading counterparties, to whom it owes no fiduciary duty, how it profits on a trade. See *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 482-83 (S.D.N.Y. 2013) (explaining that "commercial merchants generally are under no obligation to disclose their underlying costs or profits"); *Sebastian Hldgs., Inc. v. Deutsche Bank AG*, 78 A.D.3d 446, 447 (1st Dep't 2010) ("Plaintiff's alleged reliance on defendant's superior knowledge and expertise in connection with its foreign exchange trading account ignores the reality that the parties engaged in arm's-length transactions pursuant to contracts

22

between sophisticated business entities that do not give rise to fiduciary duties.").

Further, there is no authority supporting a common law fraud claim for allegedly excessive broker markups even in the broker-dealer context. *Lehman Bros Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 167 (S.D.N.Y. 2001); see also *Granite Partners*, 58 F. Supp. 2d 228, 263 (S.D.N.Y. 1999). In *Lehman*, the Honorable John F. Keenan granted summary judgment dismissing markup claims in the same context alleged here: direct FX trading. The court rejected the plaintiffs' argument "that New York law recognizes a markup fraud claim under a general theory of fraud liability based on omissions" relying upon the *Granite Partners* decision which "clearly held otherwise." *Id.*

**The Motion to Dismiss the Fraud Claims is Granted Because the FAC Does Not Adequately Plead Scienter**

For the same reasons articulated in the Court's May 19, 2016 opinion, Plaintiffs failed to plead scienter in the FAC.

23

To state a fraud claim under New York law, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). To establish that requisite inference, a plaintiff must plead facts that: (i) "demonstrate the defendant's motive and opportunity to commit or assist in the fraud," or (ii) "constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness." *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 255 (S.D.N.Y. 2008) (citing *In re Parmalat Secs. Litig.*, 501 F. Supp. 2d 560, 573 (S.D.N.Y. 2007)).

In the FAC, Plaintiffs slightly change the allegation of scienter from a generalized profit motive to Defendant's knowledge that "it was taking a markup but intentionally failed to disclose this fact to Plaintiffs." FAC at ¶ 151. Further, Plaintiffs allege scienter because Defendant made intentional misrepresentations "to induce Plaintiffs to continue to engage in business with Citibank and to cover-up the fact that Citibank had taken unauthorized markups on every one of Plaintiffs' FX trades." FAC at ¶ 29. However, these claims fall short of scienter because as the Court explained in the May 19, 2016 opinion: "there is no authority supporting a common law fraud

24

claim for allegedly excessive broker markups even in the broker dealer context." *Negrete v. Citibank*, 187 F.Supp.3d at 464.

While Plaintiffs point to an alleged party admission by Rodrigo Curiel, Plaintiffs' banker at Citibank, regarding his lying about adding markups to Plaintiffs' FX trades (FAC at ¶ 28), this claim is insufficient for scienter since the allegation does not amount to fraud. *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N.A. Holdings, Inc.*, No. 12 Civ. 4025 (AT), 2013 WL 6667601, at *19 (S.D.N.Y. Dec. 17, 2013) ("The complaint does not ascribe to the HSBC Defendants any particular motive for making these fraudulent representations beyond a general profit motive common to all corporations, which does not suffice." (citing *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)). Plaintiffs' claim for scienter is dismissed for the same deficiencies.

**The Motion to Dismiss the Fraud Claims is Dismissed Because the FAC Fails To Allege Reasonable Reliance**

New York law requires that Plaintiffs alleging common law fraud establish reasonable reliance on a material misrepresentation. For the same reasons articulated in the May 19, 2016 opinion, Plaintiffs fail to establish reasonable

25

reliance, and their fraud claims are dismissed. In "assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

Courts impose enhanced duties on sophisticated parties before deeming their reliance reasonable. That is, "where parties have access to information that could expose a misrepresentation, courts will not find their reliance sufficiently justifiable to merit legal protection." *Giannacopoulos v. Credit Suisse*, 37 F. Supp. 2d 626, 633 (S.D.N.Y. 1999).

In this case, the 2010 ISDA Agreement explicitly disclaims any reliance upon Citi. It provides "(1) No Reliance. Plaintiff is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary."

26

These types of contract provisions disclaiming reliance have been found enforceable under New York State law. "It is well settled that claims for fraud and negligent misrepresentation are barred where the party asserting the claim contractually agreed not to rely on the other party's representation." *JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, 29 Misc. 3d 1227(A), 920 N.Y.S.2d 241 at *7 (Sup. Ct. N.Y. Cty. 2010) (citing *Republic Nat'l Bank v. Hales*, 75 F Supp. 3d 300 (S.D.N.Y. 1999), aff'd, 4 F. App'x 15 (2d Cir. 2001)). Therefore, Plaintiffs' fraud claim fails for lack of reliance because they explicitly disclaimed reliance in an enforceable provision of the ISDAs.

Further, Plaintiffs were a sophisticated counterparty with access to vast amounts of information about the FX markets, which contradicts their claim of reliance. For the reasons stated, Plaintiffs have not demonstrated reliance for their fraud claims for markups and they are dismissed.

**The Motion to Dismiss the Fraud Claims is Granted Because the FAC Does Not Allege Loss Causation**

27

The doctrine of loss causation applies to common law
fraud claims such as the ones brought by Plaintiffs here as well
as the more common loss causation claims in securities fraud
cases. *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F.
Supp. 2d 339, 346 (S.D.N.Y. 2013). Therefore, a plaintiff "must
plead facts that indicate that the information concealed by the
defendant['s] misrepresentations was the reason the transaction
turned out to be a losing one." *Dexia SA/NV v. Bear, Stearns &
Co., Inc.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013). However,
Plaintiffs have not alleged that they suffered any actual
damages and that any part of their losses were caused by
Defendants' purported misconduct.

The FAC alleges that "Plaintiffs do not currently know
how much they were damaged from Citibank extracting the
undisclosed markups from them, but they estimate that it is at
least $30 million, or perhaps far more." (FAC at ¶ 100.) This
formulation of Plaintiffs' damages noticeably does not
characterize the issue with markups as lost profits; in the
original Complaint, Plaintiffs did characterize the same damages
as lost profits. Plaintiffs re-phrased their damages because
this Court determined that Plaintiffs were not eligible for lost
profit damages in the May 19, 2016 opinion. However,

"extracting the undisclosed markups" is merely a new formulation of the same concept of lost profits.  Plaintiffs argue they are entitled to the profits they would have obtained if Defendant provided best execution at better prices.

However, these alleged damages are all barred from recovery.  This is because New York follows the "'out-of-pocket' rule, which limits the damages for fraud . . . to actual pecuniary loss, [and as such,] 'there can be no recovery of profits which would have been realized in the absence of fraud." *Highland Capital Mgmt., L.P. v. Schneider*, 533 F. Supp. 2d 345, 357 (S.D.N.Y. 2008) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).  The damages alleged here are precisely the profits they would have made were it not for the allegedly fraudulent markup.

Courts have dismissed fraud claims where, as here, lost profits are the only damages sought, rather than the "actual pecuniary loss sustained as the direct result of the wrong." See, e.g., *Highland*, 533 F. Supp. 2d at 357 (where plaintiff "cannot allege any injury recoverable under a fraud claim" its "cause of action is dismissed").  In this case, there are still no direct damages alleged and no damages directly

29

resulted from the wrong.  Plaintiffs were required to allege the out-of-pocket losses they had suffered and how they were linked to alleged misrepresentations, which Plaintiffs have failed to plead.  *Spencer Trask Software & Info. Servs. LLC v. Rpost Int'l Ltd.*, 383 F. Supp. 2d 428, 455 (S.D.N.Y. 2003) ("At a minimum, the plaintiffs must make factual allegations describing the pecuniary or out-of-pocket loss sustained as a result of the defendants' alleged misrepresentations in order to maintain a claim for damages based upon fraud, and the plaintiffs in this case have failed to do so.").

In the FAC, Plaintiffs allege damages for one partially executed trade at which Plaintiffs had to cover the unfilled portion of their trade at a worse price.  This could be characterized as out of pocket damages.  Plaintiffs allege damages both for the markup, which is not compensable, and for "the loss Plaintiffs suffered from having to buy and sell their positions at prices worse than those that were contractually agreed."  FAC at ¶¶ 153, 159.  Plaintiffs allege that on February 1, 2013 Eduardo Negrete placed a limit order with an unknown person at Citibank to sell AU$10,000,000 at 1.0425 or better.  FAC at ¶ 83.  Even though the currency pair reached 1.0426 that day, .0001 better than the agreed upon price,

30

Plaintiffs allege that Defendant only sold AU$2,000,000 at
1.0425.  FAC at ¶ 83.  Plaintiffs allege that Eduardo Negrete
then needed to sell the remaining AU$8,000,000 in his position
at a lower price of 1.0417 because Citibank had not filled this
portion of the trade.  FAC at ¶ 83.

Plaintiffs in this February 1, 2013 trade allege that
they suffered damages not for lost profits, but for the
difference between the contract price and where they had to
cover the trade because of Citibank's alleged fraud.  However,
Plaintiffs are also required to show loss causation, which is
"'the causal link between the alleged misconduct and the
economic harm ultimately suffered by the plaintiff.'" *Lentell v.
Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.2005) (quoting
*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343
F.3d 189, 197 (2d Cir. 2003)); see also *Glidepath Holding B.V.
v. Spherion Corp.*, 590 F.Supp.2d 435, 457 (S.D.N.Y. 2007).
While Plaintiffs were required to plead this causal link, they
did not tie an allegedly fraudulent statement for this February
1, 2013 trade to the cause of their loss.

To plead loss causation, "'a plaintiff must allege . .
. that the subject of the fraudulent statement or omission was

31

the cause of the actual loss suffered.'" *Lentell*, 396 F.3d at

173 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion

Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).  However, Plaintiffs do

not allege that Defendant misrepresented why they could not

complete the full amount of the trade in this instance.

Instead, Plaintiffs allege that Defendant did not complete the

full transaction because of a hidden profit motive.  This hidden

motive does not show "the economic harm that [Plaintiffs]

suffered occurred as a result of the alleged

misrepresentations." *Citibank, N.A. v. K-H Corp.*, 968 F.2d

1489, 1495 (2d Cir. 1992).


For the reasons stated above, the fraud claims stated

in Claims I and II are dismissed.  These claims all failed to

plead: (1) with particularity under Rule 9(b); (2) scienter; (3)

reasonable reliance; and (4) causation.


**The Motion to Dismiss the Breach of Contract Claim for
Undisclosed Markups (Claim III) Is Granted In Part for Failure
to Adequately Plead Damages, and is Denied in Part for Claims
Covering Unexecuted Trades that Allege Real Damages**


Plaintiffs claim breach of contract for undisclosed

markups of trades by the Defendant.  All claims related to

markups are dismissed; however any claims unexecuted or

32

partially executed claims for which Plaintiffs can prove they covered at a worse price and suffered actual damages survive.

To state a claim for breach of contract, Plaintiffs must plead "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). In this case, Plaintiffs argue that they had valid contracts for certain FX trades; that Plaintiffs fully performed; that Defendants breached by adding markups, not executing certain trades, and partially executing certain trades; and that as a result of this breach, Plaintiffs suffered damages to be determined at trial.

First, the Plaintiffs had a valid agreement with Defendant for more than 35 trades described in the FAC. The ISDAs are not a completed agreement until the parties agree on the essential terms of each individual transaction. The ISDAs stated, "The parties hereto agree that with respect to each Transaction hereunder a legally binding agreement shall exist from the moment that the parties hereto agree on the essential terms of such Transaction, which the parties anticipate will occur by telephone." Slipp Decl., Ex. A at 28 of 77 (Part

33

5(1)(a)) and Ex. B at 41 of 83 (Part 5(c)(1)).  Under this
provision, there was a legally binding agreement as soon as the
parties agreed to the essential terms of each transaction over
the telephone.

Defendant argues that there would be no agreement
until Defendant sent Plaintiffs a confirmation and Plaintiffs
executed the confirmation or requested any changes within three
business days, yet Plaintiffs do not plead that there were
confirmations for any of these transactions.   Slipp Decl., Ex.
A at 28-29 of 77 (Part 5(1)(b)) and Ex. B at 41 of 83 (Part
5(c)(2).  Defendant argues that without the confirmation that
there was no agreement.  These portions of the ISDAs are in
tension creating some ambiguity about the appropriate
interpretation of the ISDAs regarding when there was a legally
binding contract.  "In interpreting a contract, the intent of
the parties governs" and that intent is ascertained by "the
plain meaning of the language employed in the agreements."
*Crane Co. v. Coltec Industries, Inc.*, 171 F.3d 733, 737 (2d Cir.
1999) (internal citations omitted).  While confirmations are
required under the ISDAs, the plain language of the contract
states that a "legally binding agreement shall exist from the
moment that the parties hereto agree on the essential terms"

34

likely over the telephone.  Slipp Decl., Ex. A at 28 of 77 (Part 5(1)(a)) and Ex. B at 41 of 83 (Part 5(c)(1)).  This language is dispositive of the parties' intent that there would be a legally binding agreement once the parties agreed to the essential terms over the telephone since the parties only called it a legally binding agreement in that section and not in the section about confirmations.

While the fraud claims failed for lack of particularity in the pleadings under Rule 9(b), "there is no requirement in the Federal Rules of Civil Procedure that the details of a breach of contract claim be pleaded with particularity.  Instead, the short, plain notice rule of Fed. R. Civ. P. 8 applies." *Contractual Obligation Prods., LLC. V. AMC Networks, Inc.*, No. 04 Civ. 2867 (BSJ) (HBP), 2006 WL 6217754, at *6 (S.D.N.Y. Mar. 31, 2006).  While Plaintiffs did not plead the fraud claims with particularity, Plaintiffs have pled sufficient existence of contracts for breach claims.

Second, Defendant does not dispute that Plaintiffs adequately performed under the contracts.

35

Third, the FAC alleges that Defendant breached over 35 specific transactions to which the parties agreed over the telephone (as well as other alleged transactions).  The parties dispute whether there was a breach in this case.  For the reasons stated in the fraud analysis, markups did not breach these agreements.  Defendant was under no obligation to offer best execution to Plaintiffs and was only obligated to trade at the agreed upon price.

However, Plaintiffs allege two other types of breaches:  (1) failure to execute a trade when the market price matched the contract price; and (2) partial execution of trades. Unlike the context of markups, these are valid examples of breach of the ISDAs combined with the alleged instructions over the phone on specific dates for specific trades.  Slipp Decl., Ex. A at 28 of 77 (Part 5(1)(a)) and Ex. B at 41 of 83 (Part 5(c)(1)).  The ISDAs state that the parties had a "legally binding agreement . . . from the moment that the parties hereto agree on the essential terms of such Transaction, which the parties anticipate will occur by telephone." *Id.* Plaintiffs allege that these agreements over the phone did exist and that Defendant breached these agreements by not executing at the

contract price.   These trades do not suffer from the same best
execution issue as the markup trades.

Finally, Plaintiffs must allege valid damages.   The
2010 ISDA limited damages by stating that "[n]o party shall be
required to pay or be liable to the other party for any
consequential, indirect or punitive damages, opportunity costs
or lost profits."  Slipp Decl., Ex. B at 42 of 83 (Part 5(g)).
Even if the markup claims stated a valid theory of breach, they
would still fail because they do not claim valid damages.   As
discussed in the fraud section, any damages measured as the
difference between the contract price and the markup price would
be a form of lost profits, which are explicitly prohibited under
the 2010 ISDA.  Slipp Decl., Ex. B at 42 of 83 (Part 5(g)).
Similarly, this limitation of liability provision in the 2010
ISDA applies to some of the alleged damages for the unexecuted
or partially executed trades.  Plaintiffs allege that they lost
the opportunity to profit and suffered an unknown additional
risk from these unexecuted and partially executed trades.   Any
claims for lost profits from markups or lost opportunities to
profit from unexecuted or partially executed trades are
dismissed.   Damage from Plaintiffs having taken on unknown risk
is not compensable under the ISDAs, as it is a form of indirect

37

damage to the Plaintiff.  Slipp Decl., Ex. B at 42 of 83 (Part 5(g)).

However, this limitation of liability provision does not cover the claims for the alleged February 1, 2013 partially executed trade described in the fraud claim section.  The difference between this one trade and the others is that as a result of Defendant's alleged conduct, Plaintiffs were forced to cover the unexecuted portion of the trade at a worse price than the contract price.  This is an out of pocket loss, which is compensable as damages under the ISDAs in contrast to the lost profits alleged in all other transactions.

For the reasons stated above, the breach of contract claim for undisclosed markups, unexecuted trades, and partially executed trades for lost profits and unknown risks in Claim III are dismissed, but all claims for covering trades at a worse price than the contract price are compensable.

**The Motion to Dismiss the Breach of Contract Claim for Cancellation of Trades Based on Erroneous Margin Calls (Claim IV) Is Granted for Failure to Use the Required Dispute Resolution Mechanism**

Claim IV alleges that as a result of "numerous" margin calls by Defendant, including specific examples, Defendant breached the ISDAs by inappropriately canceling Plaintiffs' FX orders resulting in damages of over $1,000,000. FAC at ¶ 104. For the reasons that follow, the claims for erroneous margin calls are dismissed.

Plaintiffs raise either one or two specific examples of margin calls that caused actual damages, including a December 2, 2014 margin call that resulted in $700,000 in damages, and likely the same margin call required Gervasio Negrete to "close an open forward position on December 12, 2014 and, thus, has forced to buy €5,000,000 Euros against the Mexican Peso resulting on a direct loss of US $403,177." FAC at ¶¶ 134, 144. However, the example regarding the $403,177 loss is not pled with sufficient detail to know what it refers to.

First, in the May 19, 2016 opinion, this Court already dismissed the claims related to the $700,000 loss associated with the December 2, 2014 margin call. Plaintiffs cannot reframe the same loss as no longer being lost profits. The opinion dismissed these losses as lost profits because Plaintiffs described their loss in the original complaint as

39

lost profits when they pled that if the trade had been executed as instructed, "[I]t would have resulted in at least $700,000 in profit to Plaintiffs." Compl. at ¶ 58.  However as noted above in the fraud and breach of contract sections for markups in this opinion, lost profits are explicitly prohibited from the 2010 ISDA.  Slipp Decl., Ex. B at 42 of 83 (Part 5(g)).  While the FAC now does not characterize these same damages as lost profits, "A party [] cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version . . ."  *U.S. v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984).  The claim for $700,000 in lost profits for the December 2, 2014 margin call is again dismissed under both the breach of contract and fraud claim because lost profits are impermissible damages under the 2010 ISDA.

Second, Plaintiffs allege a direct loss of $403,177 on December 12, 2014 as a result of a margin call, which required Gervasio Negrete to "close an open forward position" forcing him "to buy €5,000,000 Euros against the Mexican Peso."  FAC at ¶ 144.  Plaintiffs failed to plead which margin call this was associated with and whether they disputed the margin call.  FAC at ¶¶ 116-125.  Plaintiffs were required to dispute any

40

erroneous margin calls within the required one business day
window.  Slipp Decl., Ex. A, at 58 of 77 (requiring that a party
disputing the calculation of a margin call "will notify the
other party and the Valuation Agent . . . not later than the
close of business on the Local Business Day . . .").  Since
Plaintiffs failed to plead that they contested these margin
calls within the required window, the breach of contract claim
(Claim IV) is dismissed.

**The Motion to Dismiss the Fraud Claim for Erroneous Margin Calls
(Claim V) Is Granted as Duplicative of the Breach of Contract
Claims for Margin Calls (Claim IV)**

In Claim V, Plaintiffs allege fraud for the same
margin calls alleged in Claim IV.  These claims are also
dismissed because the conduct alleged in the fraud claim is
duplicative of the conduct dismissed in the breach of contract
claim.

The Second Circuit has held, "To maintain a claim of
fraud [based on a breach of contract], a plaintiff must either:
(i) demonstrate a legal duty separate from the duty to perform
under the contract, or (ii) demonstrate a fraudulent
misrepresentation collateral or extraneous to the contract, or
(iii) seek special damages that are caused by the

41

misrepresentation and unrecoverable as contract damages."
*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98
F.3d 13, 20 (2d Cir. 1996). Here, the fraud claims for
erroneous margin calls are based on the breach of the ISDA
contracts and the way that they require Plaintiffs to maintain
certain collateral levels and Defendant's allegedly erroneous
margin calls. However, Plaintiffs fail to meet the
*Bridgestone/Firestone* test because the fraud claim does not
establish a separate legal duty, a misrepresentation extraneous
to the contract, or special damages. *Id.* While there could be
some special damages suffered as a result of the alleged fraud
surrounding the erroneous margin calls, Plaintiffs only pled
damages for: "As result of Citibank's fraud, Plaintiffs have
been damaged in an amount to be determined at trial." FAC at ¶
182. Therefore, the fraud claim for erroneous margin calls is
dismissed.

## The Motion to Dismiss the Breach of the Covenant of Good Faith and Fair Dealing Allegations Is Granted

Plaintiffs alleged that Citibank breached the implied
covenant of good faith and fair dealing, however these claims
are dismissed for the same reasons articulated in the May 19,
2016 opinion because there are no additional claims of

42

violations of the covenant of good faith and fair dealing in the
FAC. As the Court ruled in the May 19, 2016 opinion, an implied
covenant claim "will not stand if it is duplicative of a breach
of contract claim." *Harris v. Provident Life & Accident Ins.*,
310 F.3d 73, 81 (2d Cir. 2002). In this case there is no claim
under the implied covenant of good faith and fair dealing that
survives the motion to dismiss because there are no facts
distinct from the breach of contract claim as discussed further
in the May 19, 2016 opinion.

**The Cross-Motion for Partial Summary Judgment is Denied**

The Plaintiffs have sought partial summary judgment on
their claim for breach of contract for the undisclosed markups.
As discussed in the May 19, 2016 opinion, Plaintiffs seek to
rely on Defendant's admissions in the unrelated antitrust plea
agreement and required disclosures as proof of liability under
the breach of contract claim for markups. This contention has
been rejected as set forth in the above section dismissing
Claims I and II. Partial summary judgment on these claims is
denied.

43

**Conclusion**

Upon the conclusions set forth above, the motion of the Defendant to dismiss the Complaint is granted in part and denied in part, without leave to amend, and the cross-motion of the Plaintiffs for partial summary judgment for breach of contract is denied.

It is so ordered.

**New York, NY**
**February 2⁄4̶ 2017**

ROBERT W. SWEET
U.S.D.J.

44